[No. 20183. Department Two. March 3, 1927.]

R. W. SCHULTZ *et al., Respondents,* v. C. C. CARDWELL *et al., Appellants.*[1]

[1] APPEAL (358)—DISMISSAL—AFFIDAVITS—PRACTICE ON MOTION TO DISMISS. A motion to dismiss an appeal will not be granted on facts occurring since the entry of judgment, where the affidavits showing such facts are denied.

[2] APPEAL (418)—REVIEW—FINDINGS. Findings on much evidence which was directly conflicting will not be disturbed on appeal.

[3] LANDLORD AND TENANT (39-2, 40)—FORFEITURE BY WRONGFUL ACT OF TENANT—WAIVER. The acceptance of rent, after breach of a farm lease through failing to properly feed the stock during the winter, waives the breach and precludes a forfeiture on that ground; but not so, as to a breach by allowing the stock to become diseased and failing to give proper medical treatment, where such breach was a continuing one up to the time of the declaration of a forfeiture and the trial, and threatens entire loss of the stock.

[4] LANDLORD AND TENANT (123, 124)—RECOVERY OF POSSESSION BY LANDLORD—ACTIONS—DEFENSES—JUDGMENT. Upon the cancellation of farm lease, calling for return of the cows leased with the farm, it is error to require the tenant to return a certain number of cows, where it appears that some of the cows had died and the tenant had cows of his own which he had not placed on the farm for the purpose of replacing the lessor's cows that had died.

Appeal from a judgment of the superior court for Pacific county, Hewen, J., entered March 31, 1925, upon findings in favor of the plaintiffs in an action to cancel a lease, tried to the court. Modified.

*F. M. Bond,* for appellants.

*Welsh & Welsh,* for respondents.

BRIDGES, J.—Suit to cancel and annul a lease and for the possession of the leased property.

Early in September, 1924, the plaintiffs leased to the defendants certain real estate located in Pacific county

[1]Reported in 253 Pac. 822.

and personal property located thereon. The whole constituted and was being operated as a dairy farm. In addition to the land and certain farm equipment, the lease covered "50 milk cows from 2½ to 12 years old, . . . 120 tons of hay and 125 tons of ensilage," and additional live stock. The lease was for a period of five years from September 2, 1924, with rental at the rate of three hundred dollars per month, payable monthly. It obligated the defendants to surrender the property at the termination of the lease "in as good condition and repair as when taken, reasonable wear and tear and damages by the elements excepted," and provided that "all live stock included in this lease shall be returned at the expiration hereof in like kind, grade, quantity and state of health." The defendants took possession under the lease early in September, 1924, and continued to operate the property as a dairy enterprise.

After they had been in possession for about fifteen months, the plaintiffs brought this suit to annul the lease and for the possession of the leased property. The grounds for the action were that the defendants had not properly taken care of the live stock and did not feed it sufficiently, and that as a result some of the cows died; that, because of the negligent and improper conduct of the defendants, the live stock, particularly the cows, contracted certain contagious diseases which destroyed their value for milking purposes; that, after the stock had so contracted the disease, the defendants did not use reasonable care in looking after them, but permitted the disease to spread; and that, at the time of the commencement of the suit, it had spread and was continuing to spread and that the defendants were doing nothing to prevent it; that, unless the stock was medically treated, segregated and properly

cared for, the whole herd would be destroyed; that the defendants had failed and refused to keep up the fences and make repairs upon a dike. On the other hand, the defendants denied that they had starved the cattle or failed or refused to properly feed them or that any of them died of starvation; and while they admitted that the contagious disease had infected the herd to some extent, such condition was not their fault, but that the stock had the disease when the lease was made and when the property was turned over to them. They admitted that some of the cows had died while in their possession, but denied that they were to blame therefor. They also denied that they had failed to keep up the fences and to look after the dikes.

After trial, the court found that the defendants had breached the contract in various particulars and that the lease should be cancelled and annulled. Judgment was entered accordingly, and defendants have appealed.

The testimony is very conflicting. It is also in many respects unsatisfactory because, at least to a considerable extent, of the very nature of the action and the matters to be proven. While we have given the evidence very careful consideration, resorting to a very great extent to the statement of facts instead of the abstract of the testimony, we are of the view that no considerable good can be accomplished by here making any extensive review of the facts.

[1] First of all, we are met with a motion to dismiss the appeal on the ground that the controversy has ceased, there having been an agreed settlement between the parties. Affidavits are presented by the respondents to the effect that, after the judgment was entered, the parties settled their differences, and as a part of the settlement the appellants voluntarily surrendered

to the respondents possession of the real estate and such of the personal property as was then agreed upon. On the other hand, appellants have presented affidavits showing that, while they have surrendered possession of the property in dispute, they did so only at the command of the sheriff who held and enforced an execution, and denied that they had voluntarily surrendered the property or that there had been any agreement whereby the controversy had been adjusted. In the case of *Stevens v. Irwin,* 132 Wash. 289, 231 Pac. 783, we held that,

''A motion to dismiss an appeal on account of something that has happened since the entry of the judgment may be made and supported by affidavits; and if the grounds are sufficient and undenied, it will be granted, but if the grounds are sufficient but the facts denied, the motion will be refused.''

That case does nothing more than re-state what this court has held on numerous occasions. The motion is denied.

[2] The respondents produced a large amount of testimony to the effect that the appellants, particularly during the winter of 1924-25, failed to properly house and feed the live stock, that several cows died as the direct result of exposure and starvation, and that other stock which did not die was greatly impaired in health and value as the result of insufficient feeding. There is much testimony to the effect that the winter was unusually severe and that, while the appellants housed and properly fed the cows which were at that time being milked, they turned all the other stock out on pasture and failed to feed it, and that the pasturage was insufficient to keep the stock alive. On the other hand, the appellants have stubbornly contended, and offered much proof to support their position, that the stock did not die of starvation and that it was properly

fed and taken care of. It is simply impossible to reconcile the testimony on this question. The trial court had the witnesses before it, tried the case with great care, and for these reasons and under the circumstances we are disposed to follow his conclusions. He stated that he was satisfied that the stock had, during the winter of 1924-25, suffered extremely from exposure and lack of sufficient food, and that as a result some of the animals died during that winter. We will, therefore, hold that the appellants did not take proper care of the stock and in this regard breached the terms of the lease.

We are also of the view, as was the trial court, that the appellants were responsible for the contagious disease in the cattle, particularly the cows. Each party to this action puts the blame upon the other. It appears that at once after the making of the lease the appellants brought onto the leased farm about twenty head of cows of their own, they being brought from a distant farm. The respondents contend that the leased herd got its contagious diseases from the cows that the appellants brought upon the land. This is stoutly denied by the appellants, who offered much testimony to show that their stock was at all times free of the diseases. They insist that the leased live stock had the disease to some extent at the time the lease was made and that it thereafter spread. It is very difficult to determine from the testimony who was to blame in this respect. But the trial court was satisfied that the fact that the appellants did not sufficiently feed the stock, but let them run down in flesh and health, thus greatly reducing their resisting capacity, was the cause of the disease spreading, if not the source and the beginning. We think there is much reason and common sense in this view. We hold that appellants were responsible for the spread of the disease and on this account violated the lease.

We think the testimony is insufficient to prove that appellants failed to keep up the fences or to repair the dike or otherwise properly look after the land itself.

[3] The next question discussed in appellants' brief is a troublesome proposition of law, particularly as applied to the facts of this case. It appears from the testimony that, for at least some time prior to the bringing of this suit; there was an arrangement between the parties whereby the appellants delivered their milk to the respondents, who were authorized to sell it, deduct the monthly rental of three hundred dollars, and remit the balance to the appellants. This procedure was carried on, not only up to the time of the commencement of the suit; but afterwards. Appellants contend that, by thus taking rent, respondents kept the lease alive and waived all breaches, and that they are not in position to claim a termination of the lease. They cite a number of authorities tending to support their view. In *Field v. Copping, Agnew & Scales*, 65 Wash. 359, 118 Pac. 329, we said:

"The acceptance of rent *eo nomine* is ordinarily a recognition of the continuance of the tenancy, and where it is accepted after and with knowledge of the act of forfeiture by the tenant, it is a waiver of the forfeiture."

The general rule is well stated in 16 R. C. L. 1132, as follows:

"The most familiar instance of the waiver of the forfeiture of a lease arises from the acceptance of rent by the landlord after condition broken, and it is a universal rule that if the landlord accepts rent from his tenant after full notice or knowledge of a breach of a covenant or condition in his lease for which a forfeiture might have been demanded, this constitutes a waiver of forfeiture which cannot afterward be asserted for that particular breach or any other breach which occurred prior to the acceptance of the rent. In other words,

the acceptance by a landlord of the rents, with full knowledge of a breach in the conditions of the lease, and of all of the circumstances, is an affirmation by him that the contract of lease is still in force, and he is thereby estopped from setting up a breach in any of the conditions of the lease, and demanding a forfeiture thereof.''

On the other hand, respondents take the position that, while the foregoing authorities state the general rule, there is an exception to the effect that, where the breach is a continuing one, no waiver or estoppel takes place because of the landlord taking rent. This exception to the rule is stated in 16 R. C. L. 1136, as follows:

''If the covenant or condition for forfeiture is not a continuing one and thus capable of a continuing breach, a waiver will of course operate to prevent any future claim of forfeiture. On the other hand, where it is of a continuing nature and a breach is waived, as by the acceptance of rent, this applies only as to past breaches, and the landlord is not thereby precluded from taking advantage of a forfeiture resulting from a subsequent or continued breach. Thus where a mining lease provides for its forfeiture for cessation of work for a specified time, the acceptance of rent after cessation for such time will not preclude the enforcement of a forfeiture for a continued cessation.''

The doctrine thus stated is supported by some authority, the respondents citing the foot note to 11 A. & E. Ann. Cas. 64; *Johnson v. Ft. Worth Driving Club,* 144 S. W. (Tex. Civ. App.) 1041; *Chalmers v. Smith,* 152 Mass. 561, 26 N. E. 95; *German-American Sav. Bank v. Gollmer,* 155 Cal. 683, 102 Pac. 932; *Farwell v. Easton,* 63 Mo. 446; and other cases.

In *Shepard v. Dye,* 137 Wash. 180, 242 Pac. 381, we recognized and applied the exception to the general rule, quoting from *Zotalis v. Cannellos,* 138 Minn. 179, 164 N. W. 807, L. R. A. 1918A 1066, as follows:

"By accepting the rent, plaintiff doubtless waived prior breaches of this condition, but this is a continuing condition and such acceptance did not waive subsequent breaches thereof. *Gluck v. Elkan,* 36 Minn. 80, 30 N. W. 446; *Douglas v. Herms,* 53 Minn. 204, 54 N. W. 1112; 16 R. C. L. p. 1136, § 657."

The taking of the so-called rent money may have been sufficient to have waived the right to forfeit because appellants did not properly feed the cattle during the winter of 1924-25 and the spring and summer following. But we are of the view that such actions did not estop the respondents to forfeit because of the contagious diseases among the stock. This condition was a continuing one, and, if it was a breach at all, it was a continuing breach. The situation in this regard was changing from month to month. The respondents were requesting the appellants to medically treat the stock. The spring and summer had come and they had reason to think that the cattle would increase in strength because of additional feed and thereby wear out the disease. But these things did not happen. The disease continued up to the time of the trial, and the danger seemed to be worse then than before. It would seem that if there can be such a thing as a continuing breach, this was one.

We think that the fact that the respondents took the so-called rent after they commenced their suit comes nearer estopping them than when they took it before that time. But even then, on the particular facts of this case, we doubt that there was an estoppel. These things must be considered; that respondents had appellants' money in their hands and did not have to demand it; they had declared a forfeiture; they had even commenced a suit to enforce it; the trial of that suit was delayed; the appellants were still in possession and they would be liable in some manner for the use of the

rented property; they did not expressly plead a waiver because of taking rent; they did not object to respondents taking out their three hundred dollars per month. Even while the so-called rent was being taken, the pleadings in this case were being made up and the trial was being prepared for. It would seem that the appellants must have known, by the taking of the so-called rent money, that it was not the purpose of the respondents to discontinue their suit or waive their right of a forfeiture. Some of the cases go a long way in this regard. The notes found on page 64 of 11 A. & E. Ann. Cas. point out that the acceptance of rent by a landlord after he has commenced an action to enforce the forfeiture of a lease does not constitute a waiver of the forfeiture. In *Cleve v. Mazzoni,* 19 Ky. Law 2001, 45 S. W. 88, the court held that under similar circumstances the landlord had a right to retain the amount specified as rent as compensation for use and occupancy after suit was commenced. It may be that this case is a somewhat extreme one and we are not sure that we would want to follow it in its entirety.

While we hold that respondents' conduct did not estop them from maintaining this action for forfeiture, we do so only on the particular and peculiar facts of this case and would not want to be understood as extending the rule announced to any other set of facts.

It follows from what we have said that the lease was rightfully annulled. But if we forget the points discussed—the conflict of testimony—questions which are more or less technical, and look at the case as a whole with the sole purpose of accomplishing real equity, we must come to the same conclusion. Unless these cows are separated and receive unusual care and treatment, it is highly probable that the whole herd will be lost. It will require much time and money to do these things.

We are satisfied that appellants either will not or cannot afford to be at the necessary expense. The lease should be cancelled in order to save the herd. Respondents are financially able and their ownership will furnish them sufficient inducement to do the necessary things.

[4] It will be remembered that fifty milk cows were named in the lease and were put into possession of the appellants. Subsequently, thirteen of them were by mutual consent taken by the respondents and butchered. This would leave thirty-seven. But it must also be remembered that several of these cows died, so that, at the time of the making of the judgment, there were actually several less than thirty-seven of the ones which were leased. The judgment, however, provides that the respondents are the owners of and entitled to the immediate possession of "37 milk cows." Appellants claim that the judgment is wrong in this respect, and we think they are right. The contract provided "that all live stock included in this lease shall be returned at the expiration thereof in like kind, grade, quantity and state of health." This judgment is probably broad enough to authorize the respondents to take any thirty-seven cows that they may find on the rented premises. If so, they would have to take some that belong to the appellants and some which were not included in the lease. As a matter of fact, the testimony shows that appellants had cows of their own on these lands, but they did not put them there for the purpose of complying with the lease or to make up for any stock which died. They were taken to the farm shortly after the lease was made and before any cows had died. In any event, the most that the court could do would be to require the appellants to substitute cows of the same kind and quality as those which died, and there is an

entire absence of testimony in that regard. For all that appears in the record, appellants' cows may have been much more valuable than those of respondents which died. If this be such an action as that damages for the cows which died could be recovered (a question which is not briefed and which we do not decide), the court might have ordered returned such of the originally leased cows as remained on the premises and given a judgment of damages for the value of those that died. But this was not done. Or it may be that in some other form of action the respondents would have a right to recover damages. But in the present state of the record, we are unable to see how the court would be authorized to take any of the appellants' stock and surrender it to the respondents to take the place of those that died. We are of the opinion that the judgment should go no further than to return such of the leased live stock as remained. Upon the return of the case, it will be the duty of the trial court to determine the number of cows that died, and thus arrive at the number which should be surrendered.

We have considered two or three other points which appellants have raised, but we do not find sufficient merit in them to justify a reversal or modification of the judgment.

This being an equity case, the lower court determined that neither party should recover costs of the other. We will adopt that rule here in so far as the costs on appeal are concerned.

The judgment is in all respects affirmed, except as we have directed that it be modified. The case is remanded for the purpose of modifying the judgment.

MACKINTOSH, C. J., TOLMAN, ASKREN, and PARKER, JJ., concur.