[No. 32513.   Department Two.   January 29, 1954.]

PORTION PACK, INC., *Appellant,* v. JACK BOND, *Respondent.*[1]

*Lee Olwell,* for appellant.

*Colvin & Williams* (*R. Wayne Cyphers,* of counsel) and *Edmund J. Jones,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment dissolving an injunction theretofore entered and dismissing plaintiff's action.

[1]Reported in 265 P. (2d) 1045.

Prior to April 9, 1951, Jack Bond had developed a certain method for the filling and packaging of ice cream and allied products in paper cups. He owned certain trade-marks, which had been registered in accordance with the laws of the state of Washington.

April 9, 1951, Bond and R. B. Allen entered into a written agreement under the terms of which they associated together under the name of "Allen Associates" in the promotion of the business. Bond was to own and be entitled to sixty per cent of the present or future assets of the joint venture, and Allen was to own and be entitled to forty per cent. Bond was to furnish equipment, ideas, copyrights, patents, and matters subject to patent relating to the merchandising of ice cream sundaes and kindred products, and Allen was to provide the financing. By the terms of the agreement, Bond transferred to Allen forty per cent of the assets heretofore described. The enterprise operated with more or less success (mostly less), until March 3, 1952, when the parties entered into the following written agreement:

"It is hereby agreed by and between Jack Bond and Richard B. Allen, as follows:

"(1) Richard B. Allen agrees to form a corporation to take over, sell & manage the business now operated by Allen Associates.

"(2) The corporation shall have such capital as will enable it to market & promote the aforesaid business successfully, and shall use its best efforts towards a successful business operation.

"(3) In consideration of the promises hereby set forth, Jack Bond transfers to the corporation all right of the said Jack Bond in & to the aforesaid business, patent rights, trade marks, & equipment.

"(4) Jack Bond shall have an agreement with the new corporation providing Jack Bond with a royalty of 5% of all label sales, which said agreement is binding upon the corporation, its successors & assigns.

"(5) Should the said corporation be disolved[sic], or make any voluntary or involuntary transfer of its assets or stock which results in a discontinuance of the corporate business within 10 years from date the rights herein transferred shall revert to Jack Bond.

"(6) The corporation hereby assumes & agrees to hold

Jack Bond harmless from all present and future liabilities of the business. Until such time as the corporation is formed the said liabilities are hereby assumed by Richard B. Allen.

"(7) Sales and expenses hereafter made or incurred by Jack Bond shall be covered by separate agreement between Jack Bond and Richard B. Allen and the corporation when formed.

"(8) The agreement referred to in paragraph 4, above, shall be presently binding upon both parties executing this document, and shall be transferred to the corporation when formed.

"Dated at Olympia 3/3/52.

"Witnessed & Approved         JACK BOND [signed]
"LEE OLWELL [signed]         R. B. ALLEN [signed]"

The corporation was organized under the name of Portion Pack, Inc., and its license was issued April 3, 1952, by the secretary of state. April 6, 1952, the stockholders held their first meeting. We quote the minutes:

"MINUTES OF FIRST MEETING OF STOCKHOLDERS OF PORTION PACK, INC., HELD APRIL 6, 1952

"The first meeting of the stockholders and incorporators of Portion Pack, Inc., was held at the office of the corporation, 1138 — 20th Avenue North, Seattle, Washington, at 10:30 o'clock, a.m., on the 6th day of April, 1952. There were present Lucille Greer, Lily Wells, Lee Olwell, R. B. Allen, Paul E. Davis and Arthur Siegal, shareholders and incorporators. There were also present Ethel B. Allen, Robert M. Allen and Edward Novich.

"Lee Olwell presided and R. B. Allen acted as Secretary. Mr. Olwell outlined in detail the steps which have been taken in relation to the formation of the corporation to the date of the meeting and advised the shareholders that the Articles of Incorporation have been approved by the Secretary of State and copy thereof and the necessary affidavits have been filed with the proper officials.

"Mr. Olwell reviewed the relationship of the corporation with Jack Bond and read the agreement of March 3, 1952. He pointed out that the principle asset of the corporation was the business formerly conducted by Allen Associates and that R. B. Allen had orally assigned all interest in that business, together with all the rights and obligations contained in the agreement of March 3, 1952, to the corporation. It was explained that the corporation was obligated to pay to Bond a royalty on all sales made subsequent to March 3, 1952, out

of receipts when received, at the rate of 5% of the gross receipts. The entire history of the dealings with Bond were reviewed and at the same time discussion was had with relation to the non-voting stock of the corporation subscribed to by R. B. Allen, and it was unanimously agreed by the shareholders that the stock subscribed for by R. B. Allen, both as to Class A and as to Class B stock, should be considered fully paid by reason of the transfer to and the acceptance by the corporation of all rights of Allen Associates, subject, of course, to the liabilities of Allen Associates to pay a 5% royalty to Jack Bond, as provided in the agreement of March 3, 1952.

"A considerable discussion ensued as to the advisability of hiring Jack Bond as an employee of the corporation, and in connection therewith, it was pointed out that Bond had endeavored to coerce the corporation into payment of advance royalties by refusing to file a certain patent application, which upon investigation, it was discovered that the application had already been filed. Mr. Olwell expressed the opinion that it would be preferable to have a patent attorney prepare assignments of the trade marks and patent rights covered by the agreement of March 3, 1952, and it was thereupon moved by Mr. Siegal and seconded by Mrs. Wells that Mr. Olwell should have the authority to offer on behalf of the corporation to pay to Bond advance royalties up to $250 per month for five months, contingent upon the execution of the proper instruments and agreements by Bond, to be prepared by Robert Beach, patent attorney. The motion was unanimously carried and it was further unanimously agreed that the shareholders and the corporation should make no decision at the present time regarding the hiring of Bond as an employee.

"A discussion was had regarding sending R. B. Allen to New York to confer with the Lily Tulip Paper Cup Co. and upon motion by Mr. Novich, it was unanimously agreed that R. B. Allen should make such a trip.

"R. B. Allen then discussed the matter of expenses to his office for corporation work and upon motion duly made and seconded, the sum of $100 per month was authorized for office expense and accounting.

"R. M. Allen advised the corporation that he would continue to act for the corporation, devoting his full time thereto and believed he could subsist on a minimum of $50 per week plus expenses. After discussion, the aforesaid arrangement was unanimously approved.

"The next business concerned election of a board of trus-

tees and upon motion duly made and seconded, the following board was elected to serve until the next annual meeting of the corporation or until their successors should be elected and qualified: R. B. Allen, Lee Olwell, Ed Novich, Arthur Siegal and Paul E. Davis.

"The date of the annual meeting, subject to the call of the board of trustees, was fixed at May 15 in each year, and there being no further business to come before the shareholders, the meeting adjourned at 1:00 p.m.

(Signature not legible)    Pres."

"Attest:

"R. B. Allen [signed]"

April 10, 1952, Bond went to the office of Robert W. Beach, patent attorney, where, after considerable discussion, Mr. Beach prepared three assignments to be executed by Bond to the corporation; one of an application for letters patent entitled, "Method of Making and Packing Ice Cream Sundaes"; one of the following trade-marks, "REDI-MOLD", "WALK A'LONG", and "OODLES"; and another of his entire right, title, and interest in the trade-mark "REDI-MOLD". After Bond executed the assignments, Mr. Beach handed him a check in the amount of $250, dated April 10, 1952, signed by Portion Pack, together with the following letter:

"LEE OLWELL
Lawyer
Joseph Vance Bldg., Seattle
April 10, 1952

"Mr. Jack Bond
Stratford Hotel
Seattle, Washington

"Dear Jack:

"Am enclosing check of Portion Pack, Inc. payable to your order in the amount of $250. This is a further advance on royalties, which royalties were provided for in the agreement of March 3. At the present time the corporation has authorized an advance on royalties in the amount of $250 per month for a period not to exceed five months from March 3.

"Sincerely,

"LO:lf                          "LEE OLWELL  [signed]"

"Enclosure

"Accepted:

"JACK BOND [signed]"

As he was leaving, Bond met Allen in the outer office. Allen read the assignments and asked, "How about an assignment on sealing equipment?" Bond replied that he had nothing to do with the present arrangement; that he had signed what was called for under the March 3rd agreement. (He took the viewpoint that nothing had been perfected with relation to sealing equipment.) He testified:

"A. Well, he got quite huffy and hot about it. In fact, he got ruthless, you might say. He threatened to stop payment on the check. I says, 'You go ahead and do anything you want to. You've bought something. I've signed them. I've complied with what you requested and what your attorney requested; now you do as you want.' "

He then left and went back to his hotel, where he cashed the check, paid his hotel bill, and received the balance in cash. The next morning the corporation stopped payment on the check. The hotel management locked Bond out of his room, took his clothes and personal effects, and told him to make the check good "or else." There seems to be no doubt from the evidence that Bond was in quite straitened circumstances financially. He went to the prosecutor, who told him that it was a civil matter. He then went to the attorney for the bank, who called Mr. Olwell and then told him to go to Mr. Beach's office and sign some more papers and that the check would be honored. At Mr. Beach's office he executed a "Supplemental Agreement":

"This agreement is supplemental to that certain agreement by and between Jack Bond and Richard B. Allen dated March 3, 1952, which said agreement has been assigned to Portion Pack, Inc., a Washington corporation of Seattle, Washington.

"1. Jack Bond has been paid an advance on royalties in the amount of One Hundred Dollars ($100.00) under the agreement of March 3, 1952 above mentioned, receipt of which is hereby acknowledged.

"2. Portion Pack, Inc. has paid to Jack Bond an additional advance royalty payment concurrently with the signing of this supplemental agreement, receipt of which is hereby acknowledged by Jack Bond and a certain letter dated April 10, 1952, signed by Lee Olwell as attorney for Portion Pack, Inc. and accepted by Jack Bond, provides that the said

Portion Pack, Inc, has authorized a further advance on royalties provided by the said agreement of March 3, 1952 in the amount of Two Hundred Fifty Dollars per month for a period not to exceed five months from March 3, 1952.

"3. In carrying out the terms of the aforesaid agreement of March 3, 1952, Jack Bond, otherwise known as Virgil V. Bond, has assigned to Portion Pack, Inc. patent application Serial No. 279,198, filed March 28, 1952, entitled Method of Making and Packing Ice Cream Sundaes and the entire invention disclosed in said application, the Washington State registration of the trade-mark "WALK A' LONG" No. 10409, the Washington State registration of "REDI-MOLD" No. 10600, applications for registration in the United States Patent Office of the trade-marks "REDI-MOLD," "WALK A' LONG" and "OODLES," all dated April 10, 1952.

"4. Jack Bond hereby grants to Portion Pack, Inc. the nonexclusive license to use, throughout the United States and all foreign countries, the sealing equipment and method conceived or developed by Jack Bond prior to the date of this agreement for sealing paper cups, without the payment by Portion Pack, Inc. to Jack Bond of any royalty in addition to that specified above and in the aforesaid agreement dated March 3, 1952.

"5. Jack Bond agrees that he will not, directly or indirectly, use or sell paper cup filling or sealing equipment for the packaging of salads or confections in cups, nor directly or indirectly sell or promote the sale of salads or confections packaged in cups, in any of the States of Washington, Oregon and California within five (5) years after the date of this supplemental agreement, unless Portion Pack, Inc. is dissolved or makes any voluntary or involuntary transfer of its assets or stock which results in a discontinuance of the corporate business as provided in paragraph 5 of the aforesaid agreement dated March 3, 1952.

"Signed at Seattle, King County, Washington, this 11th day of April, 1952.

"⸨VIRGIL V. BOND
⸩JACK V. BOND [signed]
"PORTION PACK, INC.
"By R. B. Allen [signed]
                                Secy.-Treas."

"Witnessed by:
"Robert W. Beach [signed]
"Lilas M. Blodgett [signed]"

Bond was then given a new check in the amount of $250 in place of the one given the day before upon which pay-

ment had been stopped. Each month thereafter, for the period not to exceed five months from March 3rd, he was given an advance on royalties in the amount of $250 in accordance with Mr. Olwell's letter of April 10th.

The record is not clear as to when he started to compete. No separate agreement was ever made to provide for Bond's employment by the corporation in any capacity. (See paragraph 7 of March 3rd agreement.) Some time after the expiration of the five months' period, Bond used and sold paper cup filling or sealing equipment, as described in paragraph 5 of the supplemental agreement. This action was then commenced by the corporation to enjoin him from so doing. Upon motion, an order was entered enjoining him, during the pendency of the action, from breaching the agreement of April 11th. Upon motion of the defendant, Richard B. Allen was made a party defendant.

Upon the trial, the court entered findings, conclusions, and judgment dissolving the injunction previously entered and dismissing the action and further decreeing the supplemental agreement to be a nullity. The corporation appeals.

Appellant contends that the trial court erred in refusing to grant judgment in accord with the prayer of appellant's complaint; in entering judgment in favor of respondent; in making and entering certain findings of fact and conclusions of law; and in denying motion for judgment notwithstanding the oral decision.

Finding No. 8 reads in part as follows:

" . . . and that ice cream products are not defined or termed in that industry a salad or confection."

*People v. Kent,* 163 Misc. 887, 296 N. Y. S. 972, defines a confectioner:

"A 'confectioner' is one who manufactures or deals in 'confections,' such as candies, bonbons, cakes, ice cream, comfits; one who makes confectionery or confections; specifically one who makes or sells candies, candied fruits, bonbons, caramels, comfits, or other articles prepared with sugar, as cake, ice cream, etc."

In *Hutchinson Ice Cream Co. v. Iowa,* 242 U. S. 153, 61

L. Ed. 217, 37 S. Ct. 28, Mr. Justice Brandeis, speaking for the court, said:

"The ice cream of commerce is not iced or frozen cream. It is a frozen confection—a compound. The ingredients of this compound may vary widely in character, in the number used and in the proportions in which they are used. These variations are dependent upon the ingenuity, skill and judgment of the maker, the relative cost at a particular time or at a particular place of the possible ingredients, and the requirements of the market in respect to taste or selling price."

■ The trial court was not correct in finding that ice cream products are not a confection. However, as we shall point out later, such error was not material to the decision of the case.

Conclusion No. 2 reads:

"That the supplemental agreement of April 11, 1952, plaintiff's Exhibit No. 6, is too indefinite to be enforceable and is void for lack of consideration in favor of the defendant, and that the defendant's signature to the agreement was procured at a time when he was unduly influenced by certain facts of the additional defendant, acting for and on behalf of the plaintiff, and that the defendant's execution of said document was procured by duress."

■ We find nothing indefinite in the supplemental agreement of April 11th. It is definite and to the point. Although part of it is repetitious, there was consideration for its execution, with the exception of paragraph 5. As to paragraph 4, Bond merely completed the performance of what he had promised to do in the agreement of March 3rd. However, the payment of the $250 check and the promise of the corporation (as indicated in Mr. Olwell's letter of April 10th) to continue to advance royalties to Bond in the amount of $250 per month were given in consideration of his having then assigned to the corporation all of his right in and to the business, patent rights, trade-marks, and equipment. Although Bond had promised to do this in the agreement of March 3rd, the promise to pay *advance* royalties was in consideration of the execution of the assign-

ments at that time. In other words, it was a compromise agreement between the parties.

■ However, there was no valid consideration for his promise not to compete, as contained in paragraph 5. If Bond had assigned the sealing equipment the day before in Mr. Beach's office, the entire deal of March 3rd would have been consummated. Payment on the check would not have been stopped, and the supplemental agreement would not have been written.

■ Furthermore, it must be remembered that, although neither party can feel too proud of his actions in this transaction, it was the appellant corporation which came into a court of equity and asked for injunctive relief. Can it be said that appellant came in with clean hands? Appellant could have gone to court and obtained an order requiring Bond to assign his rights in the sealing equipment. It was justified in stopping payment on the check when he refused to fully perform his agreement of March 3rd. However, when the officers of the corporation had him where he could not wriggle one way or the other, they were not satisfied with exacting their pound of flesh—they chose to take more. They decided to force him to sign a restrictive clause. There was no prior agreement by him that he would not compete. Such action on his part was not contemplated by the stockholders, as disclosed in the minutes of their meeting of April 6th. It was clearly an afterthought when they realized his financial predicament. Whether or not it be considered that they forced him to agree not to compete through undue influence, business compulsion, or duress, nevertheless, that agreement was procured under such means that they should not be permitted to enforce it in a court of equity.

"Equity will not interfere on behalf of a party whose conduct in connection with the subject matter or transaction in litigation has been unconscientious, unjust, or marked by the want of good faith, and will not afford him any remedy." *Income Investors, Inc. v. Shelton*, 3 Wn. (2d) 599, 101 P. (2d) 973.

The third paragraph of the judgment is amended to read:

"It Is Further Ordered, Adjudged and Decreed that Para-

graph 5 of the Supplemental Agreement of April 11, 1952, be and it is hereby declared to be a nullity, and of no force and effect, and shall not be binding on the defendant."

The judgment is, in all other respects, affirmed. Respondent shall recover his costs on appeal.

GRADY, C. J., HAMLEY, DONWORTH, and FINLEY, JJ., concur.