[No. 510-3.    Division Three.    December 7, 1972.]

PORT OF WALLA WALLA, *Respondent*, v. SUN-GLO PRODUCERS, INC., *et al.*, *Appellants.*

*Robert L. Zagelow* (of *Minnick, Hahner & Hubbard*), for appellants.

*Robert J. Williams* and *Eugene T. Golden,* for respondent.

EDGERTON, J.—Mid-July, 1966, Sun-Glo Producers, Inc. (hereafter called Sun-Glo), and the Port of Walla Walla, a municipal corporation (hereafter referred to as the "Port"), entered into a written lease agreement for certain premises and facilities located in Walla Walla County, Washington. These were to be used by Sun-Glo for storing, bagging, packaging, processing, distributing and selling farm produce, particularly potatoes, and also for storing all equipment and commodities either necessary or convenient to be used in such operations. The facilities were also to be used for transshipment of the products described, particularly to barge, rail and highway facilities in the immediate

area and on the Columbia and Snake Rivers. When the lease was signed the facilities referred to were yet to be constructed and installed. To finance the improvements and construction included in the lease, the Port had arranged for the issuance and sale of revenue bonds. These in turn were to be repaid out of the rentals payable under the lease.

The lease provided for annual rent of $14,464, payable yearly, the first payment to be made by August 1, 1966, with future payments to be made on or before July 1 of each year thereafter. However, as the trial court found, the lease did not correctly embody the intent of the parties. The witnesses testified, and the court found, the first rental payment was not due until July 1, 1967, the reason being that nothing would be due on the bonds until that time. Simultaneously with the execution of the lease Sun-Glo furnished to the Port a 5-year performance bond, with a penalty, to comply with RCW 53.08.080. It was agreed that this performance bond would be maintained or renewed throughout the life of the lease.

John B. Ford, Verdon Mason and Rodney B. Ford, and their respective wives, the sole stockholders of the common stock of Sun-Glo, personally guaranteed the performance of the lease. Sun-Glo made its first rental payment in July 1967, as agreed. During 1967 a potato failure created severe financial difficulties for the company and, on March 29, 1968, it was involuntarily adjudicated a bankrupt. The lease provided that should Sun-Glo be adjudicated a bankrupt the Port could at its option, without notice, terminate the agreement and immediately take possession of the facilities. The Port, however, did not exercise this option and Sun-Glo remained in possession of the leased property, paying the rent in July of 1968 and July 1969. On July 8, 1969 the Port issued a notice to Mr. John Ford or Ford Brothers Produce to vacate the described property, alleging it was entitled to possession because the lease between the Port and Sun-Glo had been terminated by the trustee in bankruptcy.

On July 31 the Port sued Sun-Glo and its guarantors to recover possession of the real estate and damages for unlawful detainer. The complaint alleged that Sun-Glo "went into involuntary bankruptcy" in 1968 and that the trustee of the estate of said bankrupt abandoned Sun-Glo's lease with the Port on May 20, 1969. Sun-Glo and its codefendants answered, asserted their rights under the lease, and cross-complained for damages for substantial business curtailment, interruption and destruction of portions of their business, in the sum of $200,000.

The lease specifically provided that the Port

> will not terminate this lease or the Company's right to possession of the demised facility, by reason of any default hereunder, unless written notice of any such default shall have been given by the Commission to the Company and such default shall have continued for a period of not less than thirty (30) days after receipt of such notice of default by the Company.

Until October 14, 1969 the Port gave no such notice. At that time it did mail out a notice of default as follows: (1) Rental due July 1, 1969; (2) demand for a new 5-year performance bond in the sum of $36,160; (3) reimbursement in the sum of $996 for insurance; (4) demand that $145,000 be placed in escrow in a bank pursuant to paragraph 16 of the lease to cover bond payments; (5) failure to provide financial statements. The day following, the Port prepared a supplemental complaint, incorporating the notice of default as part of the original complaint. By court order dated April 19, 1971 the Port was permitted to file its supplemental complaint.

The case was tried June 29, 1971 and, on August 9, 1971, the trial court found that the lease was in default for rental due, for failure to post a new performance bond, for failure to reimburse payments made for insurance, for failure to post cash required in escrow, and for failure to provide

financial statements, and for the bankruptcy of the lessee,[1] and concluded that the Port was entitled to recover possession of the property described in the lease, and to judgment against the defendants in the sum of $10,382.37 for unpaid rental due, and the further sum of $996 expended by the Port for insurance. The defendants were denied damages, the trial court making no formal finding or conclusion with regard to them. To the foregoing finding of fact and conclusions of law made by the trial court, the defendants assign error.

The basic issue is whether Sun-Glo was in default under the terms of the lease. Sun-Glo and its codefendants assign error to the court's holding it was in default.

The first question is whether any rent was due when the notice of default was served. The trial court found there was, at the time of trial, and granted a $10,382.37 judgment for it. But, as noted above, the trial court also found that the first annual rental payment was due August 1, 1967 and subsequently on the first day of July each year. Sun-Glo paid the rent in 1967, 1968 and 1969. Accordingly there was no further annual rental payment due until July 1, 1970. Consequently, when the notice of defaults dated October 14, 1969 was served, no rental was due and unpaid and there could be no default in rental payments until July of 1970. Hence, when the notice of default was served in October 1969 Sun-Glo was not in default for failure to pay rent.

Second, the trial court held Sun-Glo had defaulted in that it had failed to post a new performance bond as required by the lease. The lease itself recites the 5-year bond was furnished at the outset. Accordingly it was still in effect both when the Port's suit to evict was started July 31, 1969 and when demand for its renewal was made October 14, 1969. In fact it had nearly 2 years to run. The lease provided that the performance bond should be "in accord-

[1]As ultimately decided plaintiff's judgment in this case was based on six claims of default. These did not exist when the complaint was first served on defendants. No demand for 30 days to comply, as provided by the terms of the lease, had been made. It was not made until the case was pending. The original action, therefore, was premature.

ance with Section 53.08.080 of the Revised Code of Washington." It was that statute which authorized the Port to make a demand for renewal of the bond so far in advance of its need.[2] However, although the Port had a legal basis for its demand of a new bond 2 years in advance, its position in doing so was anomalous and inconsistent. The Port was seeking to destroy Sun-Glo's lease and demanding a long-term costly performance bond at one and the same time. Also, it was seeking a considerable sum of rent not then due and the deposit of a large sum of money. These demands, and the linking of other claims of default with the demand for a new performance bond, strongly indicate that supplying one would not have terminated the litigation. It seems clear from the evidence that the purpose was to defeat the lease by any means. In fact, the witness Ford testified to having made a futile attempt to post a new bond. That one was not posted during the pendency of the cause should not weigh against Sun-Glo. The law does not require one to do a useless thing to preserve one's rights.

Other developments relate to this issue of the performance bond. To straighten out the controversy between the Port and Sun-Glo defendants sought to sublease the premises. To this the Port would not agree. However, during the pendency of the Port's suit defendants sought and found a new tenant for these same premises and, on May 12, 1970, the Port entered into a new 2-year lease with one Newell F. Anderson, commencing April 20, 1970. This substitute lease was made subject to the written consent of

---

[2]RCW 53.08.080 provides in part: ". . . *Provided further,* That in a lease the term of which exceeds five years, and when at the option of the port commission it is so stipulated in the lease, the commission shall accept, with surety satisfactory to it, a bond conditioned to perform the terms of the lease *for some part of the term, in no event less than five years* . . . and in every such case the commission shall require of the lessee, another or other like bond to be delivered within two years, and not less than one year prior to the expiration of the period covered by the existing bond, covering an additional part of the term in accordance with the foregoing provisions in respect to the original bond, and so on until the end of the term so that there will always be in force a bond securing the performance of the lease, . . ."

Sun-Glo and the other defendants, and expressly provided that the "consent shall not be construed to impair or prejudice any of the rights of the parties" in this suit. It provided for an annual rental for the premises of $16,000, payable in advance, which included a sum to reimburse for insurance monies advanced. It also provided for the filing and maintenance with the Port of a good and sufficient corporate surety bond in compliance with the requirements of the laws of the State of Washington, RCW 53.08.080. This bond was furnished. Consequently at the time of trial the Port was supplied with a bond and was amply protected. Under these facts and circumstances the conduct of the Port was not equitable and invites the application of the doctrine of equitable estoppel, the requirements of which are set forth in *In re Estate of Boston,* 80 Wn.2d 70, 76, 491 P.2d 1033 (1971). Seeking equity, the Port did not do equity nor come into court with clean hands.

2 Pomeroy's Equity Jurisprudence (5th ed.) § 385, p. 52, in discussing the maxim "he who seeks equity must do equity," states:

". . . it may be applied, in fact, in every kind of litigation and to every species of remedy.

*Malo v. Anderson,* 62 Wn.2d 813, 817, 384 P.2d 867 (1963). *Malo,* at 815, quoting *Thisius v. Sealander,* 26 Wn.2d 810, 818, 175 P.2d 619 (1946) also held: " 'There is no question but that equity has a right to step in and prevent the enforcement of a legal right whenever such an enforcement would be inequitable. . . .' "

As stated in *Portion Pack, Inc. v. Bond,* 44 Wn.2d 161, 170, 265 P.2d 1045 (1954):

"Equity will not interfere on behalf of a party whose conduct in connection with the subject matter or transaction in litigation has been unconscientious, unjust, or marked by the want of good faith, and will not afford him any remedy." *Income Investors, Inc. v. Shelton,* 3 Wn. (2d) 599, 101 P. (2d) 973.

The Port's demand for a new performance bond at the time it was made lacked good faith, and the Port is estopped to claim a default on this ground.

The third claimed error involves insurance premiums. The lease in question also required insurance coverage be furnished or paid for by the lessees.[3] The Port claimed Sun-Glo to be in default for failure to reimburse respondent for insurance payments in the sum of $996, and the trial court found in the Port's favor. Again, the demand for this payment was not made until 2 months after the action was started. Sun-Glo ceased further lease expenditures awaiting the outcome of the suit. Ultimately, when the new lease with Newell Anderson was made, the amount due for insurance premiums payable under the original lease was included. John Ford testified:

> Yes, I tried to get the Port District to let me sublease the property to Newell Anderson, which they wouldn't do, so I convinced Newell Anderson and he negotiated with me to take over the lease, which he did. I had to provide him with the money to pay the lease, in addition to that I had to pay him, it totalled out to $25,000.00 that I had to finance him, and some extra. Q How was the figure $16,000.00 on this lease arrived at, if you know? A Well, it covered $14,500.00, approximately, plus $1,000.00 for insurance, plus $500.00 that we expected to retain for ourselves to carry—on the money borrowed to cover the bond, but the $16,000.00 was kept entirely by the Port. Q Now in the negotiations this lease was entered into and you accepted that lease without reservation so far as the rights under this trial? A Yes; correct. Q Is it your contention that this money should have been applied upon your lease payment? A It isn't my contention. Mr. Williams assured us that it would. He personally assured me that it would.

So the Port has been reimbursed for its expenditure of insurance premiums from income received from the substitute lease and, accordingly, is estopped to claim this item as a default. The trial court's finding of default was error.

---

[3] The lease provided: "8. It is agreed that the Commission has the option to procure the following insurance upon the completed facility, the cost thereof being borne by the Company, or it may require that the Company procure the same, adopting whichever course will result in the least possible insurance cost."

Fourth, the court held Sun-Glo in default for failure to post cash in escrow. This Sun-Glo also assigns as error. The lease in question recited that Sun-Glo was lessee of some 3,100 acres of land under a lease with Snake River Land Company, which provided that after 3 years lessor could sell or lease to another should better terms be offered but Sun-Glo would have first right to meet the terms of such proposed new lease or sale. Should Sun-Glo decline to exercise its first right and such sale or new lease occur, it was to put in escrow an amount equal to the revenue bonds then outstanding. Unable to make their rental payments to Snake River Land Company in December of 1967, Sun-Glo's lease was forfeited. The Port gave no notice of claim of default on this ground until October 14, 1969, 2 months after this suit was started. Moreover, it received rental payments from Sun-Glo in 1968 and 1969. The right to demand a deposit of this sum in escrow was waived. In addition, by the express terms of the lease this option or deposit provision was to go into effect only if there was a sale or new lease after 3 years. The Snake River lease was terminated before that. Consequently the prerequisite conditions to the operation of the deposit provision of the Port lease not having occurred there was no requirement to post money. The purpose of the provision was to provide an additional resource from any windfall capital gain Sun-Glo might realize from sale of its Snake River lease to assure payment of the bonds. The Port well knew Sun-Glo's financial position to be precarious and desired any security protection it could obtain. It knew Sun-Glo lacked sufficient funds to make a large cash deposit and that it could only do so in the event of a substantial return from sale of the Snake River lease. Knowing of Sun-Glo's loss of the Snake River lease the Port did nothing and made no demand for any deposit until after starting the lawsuit. Under these circumstances the terms of the lease must be strictly construed. Thus considered, the failure of Sun-Glo to make a money deposit was not a default, and the trial court erred in holding it was.

█ The trial court also held defendants to be in default for failure to submit to lessor the annual financial statement called for by the lease. It is Sun-Glo's position that the Port waived any right to forfeit the lease on that account. The evidence bears this out. After the first year of operation under the lease plaintiff made no request for financial reports. By accepting rent after this breach the Port waived it. *Schultz v. Cardwell,* 142 Wash. 489, 253 P. 822 (1927); *Wilson v. Daniels,* 31 Wn.2d 633, 198 P.2d 496 (1948); *Signal Oil Co. v. Stebick,* 40 Wn.2d 599, 245 P.2d 217 (1952). Further, defendant John Ford testified as an adverse witness that when the statements were offered the Port, it showed no interest in accepting them:

> Q Have you made any financial statement to the Port? A We were never asked to before that. But again, we told you—Q You were asked to by that notice? A We told you, Jack, we would be glad to do that and you said you were going to go to court anyway, so what is the use?

Thus the Port waived the requirement providing financial statements. Again, the law does not require the doing of useless things. The evidence shows that the Port did not consider the furnishing of the financial statement to be a substantial requirement or the failure to furnish same a substantial breach of the lease:

> Forfeiture clauses must always be strictly construed against the grantor, and nothing will be held to cause a forfeiture unless it plainly appears to be such. To justify a forfeiture for the violation of the condition, the violation must be wilful and substantial.

*In re Estate of Murphy,* 191 Wash. 180, 188, 71 P.2d 6 (1937), *rev'd on other grounds,* 193 Wash. 400, 75 P.2d 916 (1938); *Central Christian Church v. Lennon,* 59 Wash. 425, 109 P. 1027 (1910).

█ Finally, the trial court held that defendants were in default by reason of Sun-Glo's bankruptcy. Sun-Glo was bankrupt on March 29, 1968. Subsequently it made two annual rental payments in July 1968 and in July of 1969, and these were accepted by the Port. The trustee in bank-

ruptcy, on July 11, 1968, obtained an order that authorized him to abandon all interest in Sun-Glo's lease and, on May 20, 1969, he did abandon it and gave notice of same to the Port. The effect of this was to return title of the property to the bankrupt. 9 Am. Jur. 2d *Bankruptcy* § 943 (1963); *Collier on Bankruptcy* § 70.42[4] (14th ed. 1971). As stated in *Remington on Bankruptcy* § 1147, at 629 (1956):

> It has already been intimated that an abandonment of a potential asset by the trustee, or his declination to take it over, leaves the bankrupt in a position to assert that the property or right is not part of the estate, but his own, and make what he can out of it, for himself, not for his creditors, if there is anything to be salvaged. This is the well-established law.

(Footnotes omitted.)

The United States Supreme Court held in *First Nat'l Bank v. Lasater*, 196 U.S. 115, 118, 49 L. Ed. 408, 25 S. Ct. 206 (1904):

> We have held that trustees in bankruptcy are not bound to accept property of an onerous or unprofitable character, and that they have a reasonable time in which to elect whether they will accept or not. If they decline to take the property, the bankrupt can assert title thereto. [Citing cases.]

Disclaimer then by the trustee revests the lease in defendant Sun-Glo. Although the lease in question made lessee's bankruptcy a ground for forfeiture, the Port's nonaction and acceptance of rentals (since the bankruptcy was not a continuing breach) waived the default and continued the lease in effect. Equity abhors a forfeiture. In *Spedden v. Sykes*, 51 Wash. 267, 272, 98 P. 752 (1908) the Supreme Court said:

> This court has held the general doctrine that forfeitures are not favored in the law, and that courts should promptly seize upon any circumstance arising out of the contract or relations of the parties that would indicate an election or an agreement to waive the harsh and at times unjust remedy of forfeiture, a remedy which is oftentimes too freely granted by those who have taken no account of the misfortunes and disappointments which

conditions, unforeseen and beyond a party's control, have raised as a bar to performance, however honest may be his intent. *Whiting v. Doughton,* 31 Wash. 327, 71 Pac. 1026. Equity will enforce forfeitures when it is the contract of the parties that it shall be so. But before making its decree it will consider every agreement, every declaration, and every relation of the parties arising out of the contract; and if there be anything that warrants a finding that the parties have resolved anew, it will so decree.

And in *Dill v. Zielke,* 26 Wn.2d 246, 252, 173 P.2d 977 (1946):

It is equally well established, however, that forfeitures are not favored in law and are never enforced in equity unless the right thereto is so clear as to permit of no denial. [Citing cases.]

Defendants' cross claim for damages was not argued on appeal. The evidence in support of damages lacked substantiality and accordingly the denial of them is sustained.

In all other respects the judgment is reversed.

MUNSON, C.J., and GREEN, J., concur.

Petition for rehearing denied January 15, 1973.