The FAY CORPORATION, a
Washington corporation,
Plaintiff,

v.

BAT HOLDINGS I, INC., also known as Marshall Field & Co., a Delaware corporation; and Frederick & Nelson Seattle, Inc., a Delaware corporation, Defendants.

No. C86–542D.

United States District Court,
W.D. Washington,
Seattle Division.

March 25, 1988.

Hall Baetz & Joseph D. Weinstein, Davis, Wright & Jones, Seattle, Wash., for plaintiff.

Bruce Corker, Edward W. Kuhrau and Michael F. Mogan, Perkins Coie, Seattle, Wash., Solinger, Grosz & Goldwasser, John C. Grosz, John Eickemeyer, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

DIMMICK, District Judge.

THIS MATTER was tried before this Court without a jury March 14 to March 17, 1988. Trial followed several rulings by this Court granting partial summary judgment.[1] In a prior ruling, the Court determined that a novation had occurred with the 1982 assignment of the 99–year lease of the building and grounds on which the downtown Seattle Frederick & Nelson department store is located. This novation revived the gold clause in the lease and established plaintiff's right to rental payments in gold or its equivalency. The only issues for trial were defendants' affirmative defenses. After full consideration of the evidence and memoranda presented, the Court concludes that defendant BAT Holding I, Inc. (BAT I) is excused under the doctrines of waiver and estoppel for arrearages in rental payments from August 1982 to April 1986, when this lawsuit was filed. Defendant Frederick & Nelson Seattle, Inc. (F & NS), however, is liable for the rental arrearages from April 1986 to December 31, 1987.[2]

The plaintiff presents a classic "David versus Goliath" confrontation, with a small family-held corporation taking on a multinational conglomerate. However, both parties acted within the law as they perceived it at the time, and both were ably represented by counsel. If there is any villain in this piece, it is the 1933 Congress which rewrote existing contracts in response to a national economic emergency.

The following Opinion constitutes this Court's Findings of Fact and Conclusions of Law. If any of the findings or conclusions are incorrectly designated, they should be considered as if correctly designated.

## FINDINGS OF FACT

The 99–year lease which is the subject of this litigation was executed in 1929 between the Fay Corporation (Fay) and Frederick & Nelson (as distinct from Frederick & Nelson Seattle (F & NS), a defendant here). Neither of the defendants in the present cause of action was a signatory to

---

1. *Fay Corp. v. BAT Holdings I, Inc.*, 651 F.Supp. 307; 646 F.Supp. 946; Order of February 19, 1988.

2. March 15, 1988, plaintiff and defendants Frederick & Nelson Seattle reached a partial settlement, and stipulated to dismissal with prejudice of all claims for rent after December 31, 1987. Claims against BAT Holdings I, Inc. for rent under lease for the period prior to April 21, 1986, were not dismissed, nor were claims against Frederick & Nelson Seattle Inc. for the period from April 21, 1986 through December 31, 1987. The Court was informed of an indemnity agreement between BAT I and F & NS, but was not informed of the details.

the original lease. The leasehold was, in fact, transferred several times before the August 28, 1982 assignment from Marshall Field Delaware to BAT Holdings I, Inc. (BAT I). It was the 1982 assignment (novation), combined with action by Congress in 1977 to permit contracts to again contain gold clauses, which created the fortuitous outcome for the Fay Corporation of reviving the gold clause in the lease. Another assignment March 29, 1986, from BAT I to F & NS was similarly a novation.[3]

Article II of the lease required monthly rental payments "in lawful gold coin of the United States of America of the present standard of weight and fineness." In 1933, however, Congress outlawed gold clauses and in effect created a windfall for tenants/lessees with long-term leases. Under the 1929 lease, all of the Fay Corporation's lessees have paid to it $8,333.33 per month since 1929. The parties stipulated to a gold price that has fluctuated since August 1982 to December 1987 from a low of $287 per ounce to a high of $487 per ounce. There is no question that the Fay Corporation received considerably less per month than it would have been entitled to under the gold clause in the lease.

The lease provided that failure to pay the required rent constituted a default.

Said Lessee further covenants and agrees to and with the said Lessor that if default shall at any time be made by said Lessee, or its assigns, in the payment of the rent, or any part thereof, when due to said Lessor, as herein provided, and such default shall continue thirty (30) days after notice thereof in writing to the said Lessee, or if default shall be made in any of the other covenants, agreements, conditions, or undertakings herein contained, to be kept, observed and performed by the Lessee, or its assigns, and such default shall continue ninety (90) days after notice thereof in writing to the said Lessee, it shall and may be lawful for the Lessor, at its election, to declare the said term ended, and ... to reenter ... and to repossess....

Article IX of the Lease. At no time was BAT I informed that it was in default on its rental payments prior to commencement of this lawsuit. Fay accepted BAT I's monthly checks and deposited them without comment for a period of 44 months.

Frustration with the low rental payments caused the Fay Corporation through its President, Donald Frederick Padelford, to seek a remedy. Padelford approached the staff of Senator Jesse Helms for redress. Senator Helms was a primary sponsor of the 1977 legislation that permitted the enforcement of gold clauses in future contracts. Padelford testified to receiving no encouragement from the Senator's staff for asserting revival of the gold clause in a lease executed prior to 1977. Padelford, however, did not abandon his efforts to increase the income from the Frederick & Nelson property.

As early as 1982, he considered litigation. In May of 1983, he contacted an east coast law professor who specialized in gold clauses. That same year, Padelford started to prepare a lawsuit.

In November of 1981 attorney Willard J. Wright, Secretary of the Fay Corporation, wrote to the then lessee of the Frederick & Nelson property (the predecessor to BAT I). In this letter, the Fay Corporation stated its position.

Except to the extent actually mandated by law, we do not waive our Article II right to be paid in lawful gold coin in the standard weight and fineness prevailing in 1929. At the values prevailing in 1929, this is approximately 4,838 ounces per year. In 1933 the dollar was revalued artificially and 31 U.S.C. 463 was enacted for the purpose of avoiding windfall profits to creditors. Since that time, artificial valuations of gold have ceased, permitting the original intent of the parties to be realized: a free-market measure of the reasonable value of the leased premises. It appears beyond argument that the current payment of $100,000 present (1981) currency value was entirely uncontemplated—indeed, af-

---

**3.** *See* this Court's Order of February 19, 1988, so ruling.

firmatively rejected—by the parties in 1929, and is well below an equitable economic return on the property as of this date.

Because circumstances have changed in a manner totally uncontemplated by the parties to the Lease, we are determined to seek equitable adjustment of this matter by any available legal and ethical means. Inasmuch as equity is undoubtedly the objective of Marshall Field as well, we look forward to discussing these matters with Marshall Field in the near future.

Stephen A. Quintin, Senior Vice President of BATUS, Inc., a corporate parent of BAT I, testified to having seen the letter from Mr. Wright only after this litigation was instituted. This letter contains the only direct reference to enforcement of the gold clause in evidence, and plaintiff could produce no knowledge of the 1981 letter on the part of a BAT I official. Moreover, this letter was written prior to the novation which revived the gold clause. It could not serve as notice of Fay's non-waiver of a not-yet-existing right.

Taking another approach to seeking a rental increase, Fay engaged the services of Stephen J. Hall, Jr. in 1984. On several occasions, Hall discussed with Quintin an increase in the rent. Both Hall and Quintin testified that the approach being used by Hall was an appeal to fairness, coupled with threats of litigation which would lead to bad publicity. BAT I received no notice of Fay's asserted revival of the gold clause under a novation theory until this present suit was filed in 1986.

During negotiations in 1984–85, attempts were made by Fay to buy out the BAT I leasehold. Alternatively, Fay offered to sell the Frederick & Nelson property. Neither of these deals was consummated.

BAT I officials (Quintin in trial testimony and David Schechter by deposition) presented convincing evidence of actions which would have been taken to reduce losses had they been informed of a rental increase of some 2,000 percent. Quintin testified to the standard practice in the retail field of reducing personnel. BAT I also had the options of selling property in Oregon, subletting portions of the Frederick & Nelson property, selling the store and transferring the leasehold (as it did in 1986) or developing a new retail complex on property owned by BAT I across the street.

Defendants presented expert witness Robert Deak in an attempt to prove its hedging and capping defenses. Deak testified to the ability to hedge against rising gold prices by purchasing gold or gold mines during the period of lowest gold prices. His testimony, however, was too speculative for the Court to accept. Fay's expert witness, Paul Malatesta, further convinced the Court of the speculative nature of Deak's testimony on the ability to predict the market and purchase at the low point.

## CONCLUSIONS OF LAW

With this Court's prior ruling that the gold clause was resuscitated, defendants turned to their equitable defenses of waiver and estoppel. Defendants' capping and hedging defense is a sub-issue under estoppel, arguing for reduced payments tied to the lowest gold price available between August 1982 and January 1, 1988.

### A. *Waiver*

Defendants' strongest defense to payment of back rent comes under the doctrine of waiver.[4] Washington law recognizes a

---

4. In its Order of February 19, 1988, this Court held that the non-waiver clause in Article II of the lease should be read against the lessor as drafter. Accordingly, the Court limited this clause to prevent acceptance of currency as a waiver to later insistence of payment in gold coin. Additionally, this Court ruled that language in Article XIX applied only to limit future breaches:

No delay or omission of the Lessor to exercise any right or power arising from any default shall impair any such right or power, or shall be construed to be a waiver of any such default, or an acquiescence therein.

No waiver of any breach of any of the covenants of this lease shall be construed, taken or held to be a waiver of any other breach, or waiver, acquiescence in or consent

distinction between waiver and estoppel. *Bowman v. Webster*, 44 Wash.2d 667, 670, 269 P.2d 960 (1954). Waiver is the "voluntary relinquishment of a known right." *Birkeland v. Corbett*, 51 Wash.2d 554, 565, 320 P.2d 635 (1958). Waiver can be explicit or implied. *Panorama Residential Protective Ass'n v. Panorama Corporation*, 97 Wash.2d 23, 640 P.2d 1057 (1982) (written waiver).

> An implied waiver may arise when one party has pursued such a course of conduct as to evidence an intention to waive a right, or where his conduct is inconsistent with any other intention than to waive it.... *Waiver is unilateral* and arises by the intentional relinquishment of a right, or by a neglect to insist upon it....

*Bowman v. Webster, supra* 44 Wash.2d at 670, 269 P.2d 960 (emphasis in original), *citing Kessinger v. Anderson*, 31 Wash.2d 157, 168, 196 P.2d 289 (1948).

■ Fay seeks support for its position of non-waiver in cases involving accord and satisfaction. *See, e.g., Dodd v. Polack*, 63 Wash.2d 828, 389 P.2d 289 (1964); *Boyd-Conlee Co. v. Gillingham*, 44 Wash.2d 152, 266 P.2d 339 (1954); *Seattle Investors Syndicate v. West Dependable Stores of Washington*, 177 Wash. 125, 30 P.2d 956 (1934); *Ingram v. Sauset*, 121 Wash. 444, 209 P. 699 (1922). Plaintiff insists that these cases place the burden on a tenant to express his intent that a proffered check constitutes full payment. Principles governing accord and satisfaction, however, have no application to the circumstances of this case where there was no acknowledged dispute between the parties. BAT I paid $8,333.33 per month as had its predecessors. The checks were cashed by Fay without objection or reservation, and without notice of default under the terms of the lease.

■ Similarly, Fay fails in its attempt to limit Washington law of waiver only to circumstances in which forfeiture would result. *See, e.g., Wilson v. Daniels*, 31 Wash.2d 633, 198 P.2d 496 (1948); *Schultz v. Cardwell*, 142 Wash. 489, 253 P. 822 (1927). At issue in these cases was the effect of a landlord's acceptance of rental payments on breach of other covenants in the lease.

> The payment of rent merely gives the tenant the right of possession of the premises during the term, but it does not, during that term, give him the right to violate other provisions of the lease. Although the acceptance of rent waives the right to declare a forfeiture for prior breaches, it does not operate as a waiver of a continuance of the breaches or of any subsequent breaches.

*Wilson v. Daniels, supra* 31 Wash.2d at 640, 198 P.2d 496.

Washington law apparently requires that a party waiving its rights have knowledge of those rights.

> A "waiver" is the intentional and voluntary relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right. The person against whom a waiver is claimed must have intended to relinquish the right, advantage, or benefit, and his actions must be inconsistent with any other intention than to waive them.

*Birkeland v. Corbett*, 51 Wash.2d 554, 565, 320 P.2d 635 (1958) (quoted with approval in *Lester v. Percy*, 58 Wash.2d 501, 503, 364 P.2d 423 (1961)). Rights are relinquished by intentional or negligent failure to assert. *Bowman v. Webster, supra* 44 Wash.2d at 670, 269 P.2d 960.

The issue of a "known right" causes this Court some concern. No Washington cases were found which address the issue of waiver in the context of a legal right judicially determined to have arisen several years before.[5]

---

to any *further or succeeding breach* of the same covenant.
(Emphasis added.)

**5.** In a case contesting the paternity of a minor child, the Washington Supreme Court briefly addressed the issue of waiver on the basis of

knowledge and a party's lack of involvement in prior litigation and lack of representation by counsel. *McDaniels v. Carlson*, 108 Wash.2d 299, 300, 738 P.2d 254 (1987). This case was ultimately decided on collateral estoppel principles.

It is clear to the Court that neither BAT I nor Fay knew with any certainty that the 1982 transfer of the leasehold revived the gold clause. If BAT I had known of the legal consequences, it likely would not have accepted the assignment. If Fay had known, it would have given notice of default pursuant to the lease or commenced suit. Fay, however, was considering several avenues of litigation during the period in question. Fay held back on litigating, trading an uncertain legal outcome in order to accomplish its objective through negotiation. Moreover, Fay is charged with constructive notice with this Court's determination that a novation revived the gold clause.

Thus this Court concludes that Fay waives its right to rent escalation pursuant to the gold clause from the date of novation to the date the lawsuit was filed. Fay is presumed to have known of the revival of its gold clause rights from the date BAT I assumed the lease. Fay sat on its rights during that period as it attempted to negotiate more favorable terms with BAT I under equitable principles.

B. *Estoppel*

■ While it is not necessary for the Court to address the estoppel defense for the period between novation and filing of the suit, since the Court has concluded that rent escalation is waived during the same period, defendants have also proved an estoppel defense, which the Court accepts as an alternative to waiver.

To invoke the doctrine of estoppel, a party must prove three things:

(1) An admission, statement, or act inconsistent with the claims afterwards asserted; (2) action by the other party on the face of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

*Alcorn Trailer City, Inc. v. Blazer*, 18 Wash.App. 782, 789, 572 P.2d 15 (1977). Additionally, the party must prove that his reliance on the admission, statement or act was justified and in good faith.

A party should be held to a representation made or a position assumed where inequitable consequences would otherwise result to another party who has justifiably and in good faith relied thereon.

*Wilson v. Westinghouse Electric Corp.*, 85 Wash.2d 78, 81, 530 P.2d 298 (1975).

Fay's failure to assert its gold clause claim, while accepting monthly rental checks, were acts and/or omissions upon which BAT I justifiably relied. While Fay argues that the injury to BAT I was pure speculation, it is clear that BAT I would have taken some action to reduce its loses. It is further evident that that action would have been effective in reducing some of BAT I's liabilities. Whether that action came in the form of personnel layoffs, sales of other properties, subleasing of the Frederick & Nelson store, or development of nearby property is not critical to this analysis. BAT I with its experience in retail and property management was injured by Fay's acquiescence and failure to notify.

C. *Capping and Hedging Defense*

■ Defendants offer a defense of partial estoppel for the gold clause claim on the basis that their rental arrearages should be limited to the lowest price per ounce of gold available in the period for which they are liable. BAT I argues that had it known of its duty to pay rent pursuant to the gold clause, it would have invested in the gold market as a hedge to future increases in the price of gold. Gold reached its lowest point during this period in March of 1985, when the London price was $287.25 per ounce. Thus BAT I argues that its arrearages should be capped at that amount.

In view of this Court's conclusion above that rental increases from the date of novation to the filing of the lawsuit are excused, the only period for which this defense is applicable is from the date of filing, April 15, 1986, to January 1, 1988 (the date from

which the settlement with F & NS applies).[6]

The Court concludes that defendants' injury in this respect is speculative at best. It is not possible to determine with even relative certainty when the price of gold was at its lowest point. Defendants' capping defense is therefore insufficient.

NOW, THEREFORE, judgment will be entered pursuant to this Order, with defendant BAT Holdings I excused from payment of rental arrearages for the period prior to initiation of this lawsuit April 15, 1986. Defendant Frederick & Nelson, Seattle is liable for payment from May of 1986 to December 31, 1987 pursuant to the terms of its settlement agreement. (See footnote 2 above.)

The parties are instructed to present an agreed form of judgment for this Court's signature.

The Clerk of the Court is directed to send copies of this Memorandum Opinion and Order to all counsel of record.

---

**6.** In a prior ruling, the Court determined that the capping and hedging defense would apply only to reduce arrearages incurred prior to April 15, 1986. The Court, however, did agree to reconsider this issue at trial.