[No. B079817. Second Dist., Div. Two. Feb. 16, 1995.]

WELLS FARGO BANK, N.A., as Trustee, etc., et al., Plaintiffs and Appellants, v.
BANK OF AMERICA NT&SA, Defendant and Respondent.

**COUNSEL**

Tilles, Webb, Kulla & Grant, Stephen P. Webb, David L. Ainbender, Greines, Martin, Stein & Richland, Kent L. Richland and Feris M. Greenberger for Plaintiffs and Appellants.

White & Case, John A. Sturgeon, David J. Wilson, Matthew P. Lewis and Ullar Vitsut for Defendant and Respondent.

## OPINION

**BOREN, P. J.**—The parties contest the enforceability of a "gold clause," a price-indexing contract clause used to adjust for inflation, which was contained in a 95-year ground lease executed in 1929. Plaintiffs, a small group of family trusts and individuals, are owners and lessors, and defendant is the current tenant and lessee. The parties are successors in interest to the 1929 ground lease of prime real estate in Beverly Hills. The lease provided for an unadjusted monthly base rent of only $2,000.

We hold that although the lease's gold clause was rendered unenforceable by a 1933 federal statute, a tenant's assignment of the lease in 1981 amounted to a new obligation and a novation which rendered the gold clause enforceable under a 1977 federal statute permitting gold clauses. Our conclusion is premised on the law of novation and legislative intent in the 1977 federal legislation which permitted gold clauses in "an obligation issued" (31 U.S.C. § 5118(d)(2)) after the statute's effective date.

### BACKGROUND

Prior to the economic depression of the 1930's, gold clauses were popularly used in contracts as a crude price-indexing mechanism to adjust for inflation. (*Fay Corp.* v. *BAT Holdings I, Inc.* (W.D.Wash. 1986) 646 F.Supp. 946, 948.) Gold clauses operated by mandating payment in gold coin or its equivalent, or by tying the dollar amount due under a contract (e.g., monthly rent due under a lease) to the price of gold. (*Ibid.*)

In 1933, however, in the midst of the Great Depression, a joint resolution of Congress invalidated all gold clauses and provided that "dollar for dollar" payments in United States currency would discharge any obligation which had required payment in gold. (H.J.Res. No. 192, 73d Cong., 1st Sess. (June 5, 1933) ch. 48, 48 Stat. 112, 113 (formerly codified at 31 U.S.C. § 463).)[1] Also as a monetary reform measure, Congress banned the private ownership of gold from 1934 until the repeal of such legislation in 1973. (*Fay Corp.* v.

---

[1]As stated in chapter 48 of 48 Statutes at Large, *supra*, at page 113: "[E]very provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold . . . is declared to be against public policy . . . . Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts."

In *Norman* v. *B. & O. R. Co.* (1935) 294 U.S. 240 [79 L.Ed. 885, 55 S.Ct. 407, 95 A.L.R. 1352], the Supreme Court held that Congress could, as a proper exercise of its power over the monetary system of the nation, alter the obligations of gold clauses in private contracts, and that the constitutional power of Congress prevails over private contracts which attempt to

*BAT Holdings I, Inc., supra*, 646 F.Supp. at p. 948.) However, Congress did not address the 1933 joint resolution which invalidated gold clauses in contracts until October 28, 1977, when it amended the law to provide that the joint resolution "shall not apply to obligations issued on or after the date of enactment of this section." (Pub.L. No. 95-147 (Oct. 28, 1977) § 4(c), 91 Stat. 1229, former 31 U.S.C. § 463 note; hereinafter referred to as the 1977 amendment.) The current version of this enactment provides as follows: "An obligation issued containing a gold clause or governed by a gold clause is discharged on payment (dollar for dollar) in United States coin or currency that is legal tender at the time of payment. This paragraph does not apply to an obligation issued after October 27, 1977." (Pub.L. No. 97-258 (Sept. 13, 1982) 96 Stat. 985, 31 U.S.C. § 5118(d)(2).) Accordingly, "obligations covered by gold clauses prior to 1977 are, as before, dischargeable dollar for dollar with United States currency. But 'an obligation issued after October 27, 1977' is not so limited." (*Fay Corp.* v. *BAT Holdings I, Inc., supra*, 646 F.Supp. at p. 948, fn. omitted.)

## FACTS

In March of 1929, members of several families who owned commercial real property located at the southwest corner of Beverly Drive and Little Santa Monica Boulevard in Beverly Hills granted a 95-year ground lease on the property to the First National Bank of Beverly Hills. The stated monthly rent under the lease was $2,000. However, the lease also contained the following gold clause, intended to increase the rent due as the price of gold fluctuates: "Said net rental . . . shall be paid in gold coin of the United States of America of the present standard of weight and fineness . . . . It is expressly understood and agreed that by the word 'dollar' whenever used in this lease is meant a United States of America gold coin composed of 25.8 grains of gold .900 fine, which is the present standard of weight and fineness of said United States of America gold coin."

By 1977, after transfers of parties under the lease, the First National Bank of Beverly Hills was no longer the lessee. Triangle Company (Triangle) was the lessee, paying plaintiffs, the successors in interest to the original lessors, $2,000 per month in rent. From October 1977 to October 1981, defendant Bank of America NT&SA (the successor in interest in this litigation to the original defendants Pacific Southwest Realty and Security Pacific National Bank and hereinafter referred to as the bank) was Triangle's subtenant under a 35-year sublease and was paying Triangle $325,000 in rent per year (approximately $27,000 per month).

require payment in gold or its equivalent value in dollars. (*Id.* at pp. 307-311, 316 [79 L.Ed. at pp. 901-906].) Congress thus validly rendered gold clauses unenforceable.

In September 1981, Triangle and the bank entered into a transaction by which the sublease agreement between them was terminated and the bank became the new lessee under the 1929 lease, assuming all obligations owed under it. The terms of the transaction by which the bank became the new lessee entailed payment of $4,225,000 to Triangle for the assignment.

Both Triangle and the bank were aware before they entered into this transaction that the lease contained a gold clause. They also were aware that Congress had enacted legislation making the 1933 joint resolution of Congress prohibiting gold clauses not applicable "to obligations issued" after the effective date of the 1977 amendment.

Indeed, prior to entering into the transaction with Triangle, the bank obtained legal advice concerning the enforceability of the gold clause. The bank's legal counsel indicated it was possible that the gold clause would be enforceable, although counsel believed the risk of such a legal interpretation was less than 50 percent. In view of the risk, the bank asked Triangle for a provision that would indemnify the bank if the gold clause were later found to be enforceable. When Triangle refused to agree to such a provision, the bank nonetheless proceeded with the transaction.

Meanwhile, the plaintiffs were not informed that the bank was acquiring the lease until October 1981, after the transfer was completed. Since that month, the bank paid plaintiffs $2,000 per month in rent.[2]

In November 1986, one of the plaintiffs became aware it might be possible to require the bank to honor the gold clause after he read a newspaper article regarding a ruling in a case then pending in federal district court in Washington State, *Fay Corp.* v. *BAT Holdings I, Inc., supra,* 646 F.Supp. 946, reconsideration denied (W.D.Wash. 1987) 651 F.Supp. 307, on related grounds (W.D.Wash. 1988) 682 F.Supp. 1116, affirmed *sub nom. Fay Corp.* v. *Frederick & Nelson Seattle, Inc.* (9th Cir. 1990) 896 F.2d 1227. The *Fay* ruling endorsed the view that the post-October 27, 1977, transfer of a long-term lease containing a gold clause could constitute a novation of the lease contract and therefore amount to a new obligation issued after that date within the meaning of 31 United States Code section 5118(d)(2).

In March 1988, one of the plaintiffs sent the bank the first in a series of letters demanding that the bank pay rent at the gold clause rate. The bank continued to pay rent at the lower rate, and plaintiffs subsequently endorsed

---

[2]At the gold clause rate, the monthly rent due under the lease could have ranged, for example, from a low of $31,772.70 (based on the Mar. 1, 1993, price of gold) to a high of $47,107.58 (based on the Dec. 1, 1987, price of gold).

all rent checks received as noting that they constituted partial payment and did not waive rights under the lease for full payment.

On October 31, 1991, plaintiffs filed their complaint for breach of contract and declaratory relief. The case was tried without a jury. The evidence before the court included deposition testimony, documentary evidence and stipulated facts to which certain witnesses would testify. The trial court ruled that the assignment or novation of the lease from Triangle to the bank did not revive the gold clause, which had been declared invalid by act of Congress in 1933, and that the transfer of the lease in 1981 did not create an "obligation issued after October 27, 1977," within the meaning of 31 United States Code section 5118(d)(2). The trial court also found that the delay in bringing suit established the defenses of laches and estoppel and barred plaintiffs' claims. The trial court thus granted judgment for the bank and against plaintiffs. Plaintiffs appeal.

DISCUSSION

## I.  *Novation*

■  The essence of plaintiffs' argument is that the bank's 1981 purchase of the lease was a novation of the lease contract and thus constituted a new obligation entered into after October 27, 1977, within the meaning of 31 United States Code section 5118(d)(2), thereby rendering the gold clause enforceable against the bank and entitling plaintiffs to rent at the gold clause rate. The argument is thus premised upon the existence of a novation.

"Novation is the substitution of a new obligation for an existing one." (Civ. Code, § 1530.) The substitution is by agreement and with the intent to extinguish the prior obligation. (Civ. Code, §§ 1530, 1531; see 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 906, p. 811.) The substitution of a new obligation for an existing one may be either (1) a new obligation between the same parties, or (2) a new obligation arising because of new parties, either a new debtor or new creditor. (Civ. Code, § 1531; 1 Witkin, *supra*, § 906, p. 811; see, e.g., *Alexander* v. *Angel* (1951) 37 Cal.2d 856, 860 [236 P.2d 561] [novation exists where new debtor is substituted for prior one, who is released from contractual obligations by the creditor].) "Novation is made by contract, and is subject to all the rules concerning contracts in general." (Civ. Code, § 1532.)  ■  A novation thus amounts to a new contract which supplants the original agreement and "completely *extinguishes* the original obligation . . . ." (1 Witkin, *supra*, § 906, p. 811, italics in original; see *Beckwith* v. *Sheldon* (1913) 165 Cal. 319, 323 [131 P. 1049].)

It must " 'clearly appear' that the parties intended to extinguish rather than merely modify the original agreement." (*Howard* v. *County of Amador* (1990) 220 Cal.App.3d 962, 977 [269 Cal.Rptr. 807].) Where novation is in the form of a substitution of a new debtor for an old one, the release of the old debtor is sufficient to constitute the requisite consideration for the new debtor's promise. (*Manfre* v. *Sharp* (1930) 210 Cal. 479, 481 [292 P. 465]; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 907, p. 812.) Moreover, to constitute a novation, rather than a mere assignment, in the context of a new debtor, the former debtor must be released of his obligation by consent of the former debtor as well as the creditor. (Civ. Code, §§ 1531, 1532; *Chiarello* v. *Axelson* (1938) 25 Cal.App.2d 157, 159 [76 P.2d 731]; see *Fay Corp.* v. *BAT Holdings I, Inc.*, *supra*, 646 F.Supp. at pp. 949-950.) However, a creditor may, in advance in the underlying contract, assent to the substitution of a new debtor and discharge from liability the old debtor, thus causing a novation. (*Chiarello* v. *Axelson*, *supra*, 25 Cal.App.2d at pp. 158-159; see *Fay Corp.* v. *BAT Holdings I, Inc.*, *supra*, 646 F.Supp. at p. 952, quoting 6 Corbin, Contracts (1963) § 1297, p. 216.)

■ In the present case, the 1981 transaction transferring the lease to the bank was a novation. The bank's purchase of the lease from Triangle completely extinguished Triangle's obligations to plaintiffs, leaving plaintiffs to look only to the bank for performance of the lease. Specifically, Triangle conveyed to the bank in 1981 all of its "right, title and interest in and to the Ground Lease," and under the terms of the 1981 assignment of the ground lease the bank agreed to be bound by and perform "all of the agreements, covenants and obligations" under the lease. The bank deemed "the leasehold estate of the lessee [as] sold and assigned to [it]." As to the requisite intent to extinguish the prior obligation of Triangle, the 1929 lease itself expressly provided that the lessee "shall be relieved of all liability accruing under this lease from and after the date of any assignment . . . ."

The 1981 transfer of the lease to the bank thus constituted a new obligation, nullifying the old Triangle lease (see *People* ex rel. *Dept. of P.W.* v. *Auman* (1950) 100 Cal.App.2d 262, 263 [223 P.2d 260]) and creating a new obligation between the plaintiffs as lessors and the bank as lessee. This new obligation constituted a novation within the meaning of Civil Code section 1530 et seq.[3]

---

[3]We note that California law controls our interpretation of novation, even though our ensuing analysis involves the application of a federal statute. There is no federal law of contracts. (See, e.g., *Vernon* v. *Resolution Trust Corp.* (11th Cir. 1990) 907 F.2d 1101, 1109.) "State law controls both the construction of the contract and the question of breach." (*In re Aslan* (9th Cir. 1990) 909 F.2d 367, 369.)

## II. *Interpretation of 31 United States Code Section 5118(d)(2)*

As previously discussed, in 1977, Congress expressly amended the Joint Resolution of 1933 and stated that the prohibition against gold clauses would not apply to such clauses in an "obligation issued" on or after the date of the congressional enactment. (31 U.S.C. § 5118(d)(2) (formerly codified at 31 U.S.C. § 463).) The bank urges that a novation, which by definition is a "new obligation" (Civ. Code, § 1530), is not a new obligation within the meaning of the phrase "obligation issued" as used in the 1977 amendment. According to the bank, an obligation is "issued," meaning "entered into" (*Rudolph* v. *Steinhardt* (11th Cir. 1983) 721 F.2d 1324, 1330; *Fay Corp.* v. *BAT Holdings I, Inc.*, *supra*, 646 F.Supp. at p. 949), within the meaning of the 1977 amendment on the date the original parties made the original contract containing the gold clause. The bank thus urges that the gold clause in the present case was "issued" on March 1, 1929, made unenforceable by Congress in 1933, and remains unenforceable today. On the other hand, plaintiffs urge that the 1981 novation constituted a new "obligation issued after October 27, 1977." (31 U.S.C. § 5118(d)(2).)

### A. *Legislative Intent*

The parties assume some inherent ambiguity in the phrase "an obligation issued," i.e., whether the obligation issued pertains to only the original parties to the original contract or pertains to subsequent parties involved in a novation. Such an ambiguity would invite statutory construction: "Where language [of a statute] is susceptible of more than one meaning, it is the duty of the courts to accept that intended by the framers of the legislation, so far as its intention can be ascertained." (*Stillwell* v. *State Bar* (1946) 29 Cal.2d 119, 124 [173 P.2d 313]; see *Sand* v. *Superior Court* (1983) 34 Cal.3d 567, 570 [194 Cal.Rptr. 480, 668 P.2d 787].) The legislative history of the statute would thus be relevant in discerning the intent of the Legislature. (*Sand* v. *Superior Court*, *supra*, 34 Cal.3d at p. 570.)

However, "[i]n determining intent, we look first to the words themselves. [Citations.] When the language is clear and unambiguous, there is no need for construction. [Citations.]" (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154].) We view the phrase "obligation issued" as sufficiently lacking in any genuine ambiguity as to preclude the necessity of an examination of legislative history to determine intent. Neither the words themselves nor any other contextual language in the statute restricts the "obligation issued" to any particular parties or otherwise precludes application of the statute to a novation. A fair reading of the statute reveals the language in question is unambiguous and leaves no

legitimate doubt as to its unfettered scope and the inapplicability of the fanciful limitation urged by the bank. It is thus unnecessary to resort to extrinsic aids to ascertain the purpose behind the statute and to give the phrase a judicially created meaning commensurate with that purpose. (See *Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46].)

Nonetheless, as the parties have dwelled so on legislative history, we turn to that often murky arena for enlightenment. ■ Courts are generally reluctant to rely on the position of one legislator to reveal legislative intent except, as here, where the speaker was the author of the bill and no other interpretations of the statutory language exist. (*Rudolph* v. *Steinhardt, supra,* 721 F.2d at p. 1330.) Comments by the author of a bill are properly considered where such comments were before the legislative body and presumably entered into its deliberations in passing the bill. (See *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700 [170 Cal.Rptr. 817, 621 P.2d 856].)

■ In the present case, Senator Jesse Helms was the principal author of the 1977 amendment, originally introduced as Senate Bill No. 79 on January 10, 1977. (*Rudolph* v. *Steinhardt, supra,* 721 F.2d at p. 1330.) At that time, Senator Helms made several remarks regarding the bill: "Right now, contracts can be made specifying payment in any commodity—except gold. In this day and age, such a prohibition is anachronistic." (Remarks of Sen. Helms, 123 Cong. Rec. 633, 633 (1977).) "Anyone can enter into agreements which state that a sum of dollars will be paid on a certain date measured in the value of porkbellies or any other commodities. But, because of this archaic provision on the books, we could not use gold as a measure of payment." (*Id.* at p. 634.) Senator Helms further observed: "The text of my proposal is slightly different from that of the bill I have previously introduced on this topic. My bill, if approved, will make enforceable, gold clause contracts entered into after the enactment of the bill. It is intended to stand neutral with regard to the enforceability of gold clause obligations issued in the past. . . . I would not want any legislation to prejudice [a case pending in the courts] one way or another." (*Id.* at p. 635.)[4]

It is undisputed that Senator Helms intended the 1977 amendment to permit, in the words of the senator, "gold clause contracts entered into after

---

[4]Senator Helms's reference to his "previously introduced" version of this legislation was to a prior version of the bill which simply would have repealed the section in the 1933 legislation prohibiting payment pursuant to gold clauses. (See Remarks of Sen. Helms, 122 Cong. Rec. 17918, 17919 (June 14, 1976) ["Sec. 2. That the joint resolution of June 5, 1933, entitled 'Joint resolution to assure uniform value to coins and currencies of the United States' (31 U.S.C. 463) is hereby repealed."].)

the enactment of the bill." However, contrary to the view taken by the bank, the reference by Senator Helms to the intent to "stand neutral with regard to the enforceability of gold clause obligations issued in the past" does not defeat plaintiffs' application of the law of novation. The 1977 amendment stands neutral in that it does not specifically abrogate the 1933 joint resolution, as a previously introduced but unpassed version of Senator Helms's bill would have done. However, the 1977 amendment is also neutral in that pre-1933 contracts with gold clauses remain subject to the traditional laws of contract, as judicially interpreted, which include the concept of novation. Accordingly, notwithstanding Senator Helms's remarks, subsequent actions of the parties to a contract, including successors in interest, can amount to a novation and thus a new obligation within the meaning of the 1977 amendment.

Any other interpretation would fly in the face of the California law of novation which, as previously discussed, deems a novation a new obligation which completely extinguishes the original obligation. The bank mistakenly interprets plaintiffs' theory as an effort to "revive" a pre-October 27, 1977, gold clause. The term "revival" is appealing in characterizing the chronology of events but is misleading and erroneous in describing a novation, which extinguishes the original obligation and creates a new one.

Moreover, contrary to the bank's assertion, the *Fay* novation analysis, which we adopt, need not be rejected because it "proves too much" in that it would purportedly revive every single gold clause. Such rhetoric again ignores the fact that a novation creates a new obligation which contemplates a new agreement among all the contracting parties. Pre-1977 gold clauses would thus be enforceable only where there is a valid consent to a novation, though it is not necessary for a novation that all the parties manifest their assent simultaneously or in the same document. As previously discussed, not every assignment amounts to a novation. As in the case of a lease, the release of a transferor can be controlled by the original parties to the lease who can specify by provisions in the lease the terms by which a release can be effected or not. A novation can only occur where the lessee is released from liability upon assignment. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 906, pp. 811-812; see *Fay Corp.* v. *BAT Holdings I, Inc.*, *supra*, 646 F.Supp. at pp. 950, 952.) Accordingly, whether a gold clause originally agreed to prior to 1933 has any effect after the 1977 amendment is simply a matter of contract law and an analysis of the concept of novation under state law.[5]

If Congress (or Senator Helms) had intended to restrict the 1977 amendment only to an original contract involving the original parties and not to a

---

[5]The bank raises the specter that as to bonds which contain gold clauses, bondholders would only need to sell their bonds to revive the gold clauses for the buyer. However, we note

novation amounting to a new obligation with, as here, successor parties, such narrowing language could have been used in the amendment. As worded, the 1977 amendment is applicable to the general contract law of novation, and there is no indication that Congress intended otherwise.

### B. *Other Gold Clause Cases*

According to the bank, apart from the *Fay* case, every other court which has faced this issue has refused to enforce or to revive pre-1977 gold clauses. However, the salient fact is that no case but *Fay* has involved a gold clause in the context of a novation analysis. The bank's reliance on the holding in other cases is thus misplaced.

For example, *Gold Bondholders etc.* v. *Atchison, Topeka, supra,* 649 P.2d 947, involved bonds issued in the 19th Century where latter-day purchasers of the bonds demanded payment of interest owing in gold coin. The Alaska Supreme Court rejected their claim, holding that although the bonds were delivered in 1980, no new contractual obligation was issued, i.e., entered into, at that time. (*Id.* at p. 950.) It is difficult to accept the bank's argument that the case dealt with novation when the opinion never once mentioned the word.

Similarly, *Schickler* v. *Santa Fe Southern Pacific* (1992) 229 Ill.App.3d 291 [171 Ill.Dec. 141, 593 N.E.2d 961] involved gold clauses in 100-year bonds originally issued in 1895, with modern-day holders of the bonds demanding that interest owed on them be paid in gold coin or its equivalent rather than with United States currency. The Illinois appellate court rejected the bondholders' argument that changes in federal law regarding gold ownership and the minting of gold coins constituted changed circumstances which should render the 1933 gold clause ban invalid. (*Id.* at pp. 965-966.) The Illinois appellate court merely cited Congress's enactment which expressly limited the repeal to obligations issued after October 27, 1977 (*id.* at pp. 966-967); novation was not at issue.

---

that a bond's "date of issue" for determining when an "obligation issued" (31 U.S.C. § 5118(d)(2)) and applying a gold clause has been deemed only the date of the first purchase of the bond, not each purchase or delivery of the bond after its first purchase. (*Gold Bondholders etc.* v. *Atchison, Topeka* (Alaska 1982) 649 P.2d 947, 950.) Such an interpretation focuses on the legal structure of bonds and not novation.

As to whether a creditor, such as a landlord owner, can create a novation (see Civ. Code, § 1531, subd. 3) and thus a new obligation within the meaning of the 1977 amendment by sale of the real property, that issue is not before this court and need not be addressed. Nonetheless, as to the landlord owner no obligation is ever incurred as to rent. That obligation is incurred by the tenant. And, the tenant typically continues to pay the same rent under the same lease to the new landlord owner. (See *Kirk Corp.* v. *First American Title Co.* (1990) 220 Cal.App.3d 785, 809 [270 Cal.Rptr. 24].)

Equally inapplicable is the bank's reliance on *REC Centers, Inc.* v. *Shaughnessy* (Fla.Dist.Ct.App. 1981) 407 So.2d 971, where the issue before the court was whether particular language in a 1967 lease constituted a gold clause, and the court noted without discussing novation that the "obligation here was created prior to October 28, 1977." (*Id.* at p. 972, fn. 1.) *Rudolph* v. *Steinhardt, supra,* 721 F.2d 1324, also has no application to a novation. In *Rudolph,* the court rejected the argument that a gold clause in a 1970 lease was enforceable with regard to rent due after October 27, 1977, because each payment due under the lease was purportedly a separate obligation "which is 'issued' when the payment is due." (*Id.* at p. 1330.) In rejecting this argument, the court held instead that the phrase "obligation issued on or after" in the 1977 amendment referred to the point when the lease obligation was entered into and not to each payment as it became due. (*Id.* at pp. 1330-1331.) As the court in *Fay Corp.* v. *BAT Holdings I, Inc., supra,* 646 F.Supp. at page 949, footnote 6, observed, there was no transfer at issue in the 1970 lease in the *Rudolph* case. Nor is *Henderson* v. *Mann Theatres Corp.* (1976) 65 Cal.App.3d 397 [135 Cal.Rptr. 266] applicable; it addressed whether the gold clause ban survived certain 1973 federal legislation permitting individuals to deal in gold as a commodity and did not involve novation.

The *Fay* case, on the other hand, did involve the question of novation, and we similarly conclude that a novation is a new obligation within the meaning of the 1977 amendment. The suggestion by the bank in the present case that the litigants in *Fay* erroneously stipulated that the lease agreement fit into the 1977 amendment's definition of an obligation issued after its effective date is unpersuasive. In fact, the *Fay* parties stipulated only that the phrase "obligations issued after October 27, 1977" in the statute was "intended to mean an obligation (including contractual obligations) 'entered into' after that date." (*Fay Corp.* v. *BAT Holdings I, Inc., supra,* 646 F.Supp. at p. 949.) Indeed, the bank agrees with the appropriateness of interpreting "issued" as meaning "entered into," as did the parties in *Fay.* (See also *Rudolph* v. *Steinhardt, supra,* 721 F.2d at p. 1330 ["issued" was intended to mean "entered into"].) In sum, we reach the same conclusion as did *Fay,* the only case to address a gold clause in the context of novation.

III. *Affirmative Defenses of Estoppel and Laches*

A. *Estoppel*

A party asserting the defense of estoppel must establish the following elements: (1) the party estopped must know the facts; (2) the party

estopped must engage in conduct intended to be acted upon by the party asserting estoppel; (3) the party asserting estoppel must be ignorant of the true state of facts; and (4) injury must result from reliance on the other's conduct. (*Hair* v. *State of California* (1991) 2 Cal.App.4th 321, 328 [2 Cal.Rptr.2d 871].) "It is the burden of the party asserting estoppel to prove all of its requisite elements, and the doctrine is strictly applied and must be substantiated in every particular." (*El Camino Community College Dist.* v. *Superior Court* (1985) 173 Cal.App.3d 606, 614 [219 Cal.Rptr. 236].)

█ In the present case, uncontradicted evidence established that (1) plaintiffs were ignorant of the bank's purchase of the lease until after the transaction had been completed; (2) despite plaintiffs' delay in filing litigation, there is no indication plaintiffs intended such delay would result in a transaction of the sort indulged in by the bank; (3) the bank was fully aware of the risk that the gold clause might be enforced, as indicated by the opinion of counsel it had solicited; and (4) the bank was not injured but rather obtained a financial windfall.

The failure of substantial evidence to establish the last element of estoppel, detrimental reliance, is most compelling. The bank points to its payment of over $4 million to Triangle in 1986 pursuant to the assignment agreement and payment of over $840,000 in property taxes and payment for various building repairs and maintenance expenses. However, these expenses were not incurred in reliance on plaintiffs' silence. The 1986 payment to Triangle was made pursuant to an assignment agreement entered into and binding in 1981, a time prior to plaintiffs' knowledge that Triangle was selling the lease. This payment was thus pursuant to a preexisting legal obligation and not in reliance upon any conduct by plaintiffs. As for property taxes and maintenance and repair expenses, these financial obligations were undertaken pursuant to the terms of the lease and not in reliance upon plaintiffs' delay in initiating the suit.[6]

Delay alone cannot be the basis for a finding of estoppel. (See *City and County of San Francisco* v. *Pacello* (1978) 85 Cal.App.3d 637, 645 [149 Cal.Rptr. 705]; *Donovan* v. *City of Santa Monica* (1948) 88 Cal.App.2d 386, 396 [199 P.2d 51].) Accordingly, although plaintiffs delayed in initiating

---

[6]It is unnecessary to determine the extent to which the expenses cited by the bank may be offset by the rent reduction the bank obtained by purchasing the lease and paying rent of only $2,000 per month rather than at the market rate it previously had been paying Triangle, aside from the bank's profits from a parking garage concession and the market rate rent received from a restaurant subtenant. However, plaintiffs allege if the bank has not yet broken even regarding its expenses attendant to the 1981 transaction, it will do so soon and have a substantial net gain during the approximately 40 years remaining on the lease.

their gold clause claim, the bank has failed to establish any of the requisite elements of the defense of estoppel.

B. *Laches*

■ Laches is an unreasonable delay in asserting an equitable right, causing prejudice to an adverse party such as to render the granting of relief to the other party inequitable. (See *Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 [82 Cal.Rptr. 337, 461 P.2d 617]; *Marriage* v. *Keener* (1994) 26 Cal.App.4th 186, 190 [31 Cal.Rptr.2d 511].) ■ Apart from the bank's failure to establish prejudice by plaintiffs' delay, as previously discussed in the context of estoppel, which is sufficient to reject the bank's laches defense (see *Weitz* v. *Yankosky* (1966) 63 Cal.2d 849, 857 [48 Cal.Rptr. 620, 409 P.2d 700]), the laches defense is unavailable in an action at law for damages "even though combined with the cumulative remedy of declaratory relief." (*Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 462 [326 P.2d 484].)

In the present case, the complaint alleges two causes of action concerning money damages. One, breach of contract, is clearly an action at law for damages; the other, seeking declaratory relief, is essentially also a dispute regarding money.

Although declaratory relief is an equitable proceeding, whether laches is available in a declaratory relief proceeding depends upon the nature of the underlying claim. For example, in *Mandracio* v. *Bartenders Union, Local 41* (1953) 41 Cal.2d 81, 85 [256 P.2d 927], the Supreme Court reversed a finding of laches in an action formulated as a declaratory relief action but which really amounted to a an action for damages. Likewise, in *Abbott* v. *City of Los Angeles*, *supra*, 50 Cal.2d 438, the Supreme Court reversed a finding of laches because the doctrine was unavailable "as a defense to the causes of action [at law] seeking money judgments," even where joined with claims in equity. (*Id.* at p. 462.) "The equitable doctrine of laches has a legal equivalent in the statutes of limitations. To allow a laches defense in a legal action would be to override a time limit mandated by the Legislature." (*Unilogic, Inc.* v. *Burroughs Corp.* (1992) 10 Cal.App.4th 612, 619 [12 Cal.Rptr.2d 741]; see *Bagdasarian* v. *Gragnon* (1948) 31 Cal.2d 744, 752 [192 P.2d 935].)[7] The equitable defense of laches is thus unavailable to the bank and cannot constitute a defense to plaintiffs' claims.

---

[7]Accordingly, in the present case relief is unavailable for damages incurred more than four years before the action was filed (see Code Civ. Proc., § 337), and a new breach occurs each month the bank persists in its refusal to pay rent at the gold clause rate. (See *Abbott* v. *City of Los Angeles*, *supra*, 50 Cal.2d at p. 460.)

## DISPOSITION

The judgment is reversed, and the superior court is directed to enter judgment in plaintiffs' favor. Plaintiffs are entitled to costs on appeal.

Fukuto, J., concurred.

**GATES, J.,** Concurring.—The facts underlying the present proceeding appear to be virtually sui generis. That is, still operative pre-1933 gold-clause leases are apparently most rare and one that expressly grants preapproval for the complete and automatic release of the lessee upon assignment, essentially unique.

I, therefore, concur in the judgment but express no opinion regarding what determination would have been appropriate even in this peculiar instance had the lessee-assignor and the assignee not been fully aware of, and consequently knowingly assumed the risk of, the potential consequences of their transaction prior to its consummation.

A petition for a rehearing was denied March 16, 1995, and respondent's petition for review by the Supreme Court was denied June 6, 1995. Lucas, C. J., Mosk, J., Baxter, J., and George, J., did not participate therein.