Filed 3/25/16  Sleep Concepts Therapy v. Evans CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SLEEP CONCEPTS THERAPY, LLC, | B259548 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC492086) |
| v. | |
| DAN EVANS et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph R. Kalin, Judge.  Reversed in part, affirmed in part.

Law Offices of Brett W. Wolff, Brett W. Wolff, for Defendants and Appellants.

No appearance for Plaintiff and Respondent.

_____

Dan and Jackie Evans[1] appeal from a judgment after a bench trial, which awarded $500,000 in general damages for breach of contract and $50,000 in punitive damages in favor of Sleep Concepts Therapy, LLC (hereafter, Sleep Concepts).[2] We decline to find a novation of the parties' merchandise licensing agreement, but agree with appellants that the damage award is not supported by substantial evidence and reverse that portion of the judgment.

**FACTUAL AND PROCEDURAL SUMMARY**

Appellants competed in the NBC fitness reality series "The Biggest Loser" in 2008. In May 2010, they met Bernard Hicks, a businessman with experience in product development, at an event organized by the Aerobics and Fitness Association of America, for which Hicks had obtained a "Biggest Loser" license. Afterwards, appellants, Hicks and Shannon Nilsen (Hicks's wife), began meeting socially. Appellants mentioned that they ran half-marathons to raise money for their children's foundation and were

---

[1] Appellants, mother and son, share the same last name; for clarity, we refer to them by their first names when necessary.

[2] The pleadings are not in the record, but the case caption and trial court docket identify Sleep Concepts as the sole plaintiff, as does the trial court's minute order, which awarded damages to plaintiff. Appellants, who were defendants in the case brought against them by Sleep Concepts, cross-complained against Sleep Concepts and two individuals, Bernard Hicks and Shannon Nilsen. The court's minute order identifies Hicks and Nilsen solely as cross-defendants. However, the judgment identifies all cross-defendants as plaintiffs. In their opening brief, appellants do not raise any issues regarding the cross-complaint, but they refer to Sleep Concepts, Hicks, and Nilsen collectively as plaintiffs and respondents, even though in the case information Sleep Concepts is listed as the sole respondent on appeal. This Court has been informed of Hicks's death, but there has been no motion to substitute another respondent in his place and no appearance for him or for any other respondent.
Because the identification of all cross-defendants as plaintiffs appears to be in error, for purposes of this opinion we assume that Sleep Concepts was the only plaintiff, that damages were awarded solely in favor of Sleep Concepts, and that the appeal is prosecuted solely against Sleep Concepts. Although Sleep Concepts, Hicks, and Nilsen were jointly represented at trial, to avoid confusion we identify the attorney, trial brief, and exhibits only by reference to Sleep Concepts.

2

interested in creating a race series called "The Biggest Loser RunWalk" (hereafter, RunWalk). Dan said he enjoyed cooking at home and that he cooked low-calorie meals to keep the weight off. He said he made dressings and sandwich-type spreads that had only 10 to 15 calories per serving. Hicks and Nilsen recalled specifically that Dan mentioned a Chipotle Ranch Dressing and that he complained it was difficult to retain the taste while reducing the calories.[3]

Appellants asked Hicks to help them obtain a license for RunWalk from NBC, and Hicks suggested that they also could pitch a product line based on Dan's low-calorie dressing recipes. On July 29, 2011, appellants, Hicks, and Nilsen entered into a memorandum of understanding to form a company that would be held in equal shares by appellants on the one hand and Hicks and Nilsen on the other.[4] The purpose of the new company was to secure licensing agreements with NBC to market RunWalk and a line of dressings, sauces, spices, and marinades, both under the "Biggest Loser" brand. A company called FitWorld Group, LLC (hereafter, FitWorld) was formed, which was owned in equal shares by appellants on the one hand and Boots Holdings, LLC, an entity owned by Hicks, on the other. Around the same time, Jackie obtained a domain name for the product line under the name "SlimSauce," and Hicks applied to trademark the name.

In August 2011, Hicks pitched both licensing ideas to Consumer Strategies Group, an agency affiliated with NBC. His presentation included a slide listing calories and nutritional information, which he admitted was "just a label from a jar." Another slide described the product as "low-calorie, low-fat, low-sugar, high-taste" and "formulated by [appellants] and a team of nutritionists, people who know that every drop counts." Hicks

---

[3] At trial, Dan clarified that the base for his dressings, sauces, and spreads is Hellmann's low-fat mayonnaise, which contains 10 to 15 calories per serving. He mixed it with seasonings, such as garlic or Chipotle. Dan testified that he tried but could not make low-fat or no-fat mayonnaise on his own, and that Hicks assured him there were professionals who could help him.

[4] Neither this, nor most of the subsequent agreements between appellants, Hicks, Nilsen, and entities incorporated by Hicks are in the record on appeal. We glean their terms from references made to them at trial and in other documents.

explained this language was based on appellants' participation in "The Biggest Loser," where they had worked with personal trainers to get in shape and with nutrition experts to develop a proper diet.

NBC agreed to license RunWalk, but not SlimSauce because it preferred to work with a large food company with an established distribution system rather than build another company's brand using the "Biggest Loser" license. The October 31, 2011 RunWalk merchandising deal memo with NBC included a $1.5 million guarantee, which required FitWorld to make two initial payments of $225,000, due in December 2011 and March 2012 respectively.

According to Hicks, shortly after closing the deal with NBC, appellants demanded a 75 percent share of FitWorld; to resolve the ensuing stalemate, on November 12, 2011, he proposed that the members' respective shares in the company could be adjusted based on their respective contributions on the fees due to NBC. Hicks's proposal followed after a potential investor already had demanded a share in FitWorld that would have significantly diluted the members' shares had they accepted the investment. Jackie countered with a proposal of her own: that appellants could focus on RunWalk, raise the funds for it, and retain 75 percent of that business, while Hicks could focus on SlimSauce, in which he would have a 75 percent interest. She acknowledged that she did not have faith in the viability of SlimSauce after NBC declined to license it. In a subsequent email, Hicks memorialized the parties' negotiations: if appellants were successful in finding an investor for RunWalk, they would have an increase in ownership in FitWorld, from which they would finance the investment; the increase in ownership would not apply if all members collectively solicited the investor.

Appellants were able to find investors to cover the first $225,000 payment due to NBC on the RunWalk license, in return for 15 percent of FitWorld, which was to come out of their ownership share. But NBC concluded FitWorld was not a credit-worthy company, and it demanded a $750,000 advance instead of the initial $450,000 by March 2012.

4

Meanwhile, Hicks negotiated a promotional contract with Consumer Strategies Group, the NBC agent to which he had originally pitched the SlimSauce idea. The contract was to be on behalf of Sleep Concepts, a company already incorporated by Hicks. Because he needed to secure appellants' commitment to provide recipes and endorse the SlimSauce product line, on December 9, 2011, he sent appellants a draft merchandise licensing agreement (hereafter, MLA), limited exclusively to SlimSauce. In the accompanying email, he asked if Dan had any written recipes that could be included in the MLA but received no response.[5]

Appellants signed the MLA on January 20, 2012.[6] They received a 25 percent share in Sleep Concepts and were required to provide "proprietary recipes for sauces and dressings formulated" by them, as well as other agreed-upon licensing marks, which according to Hicks included the SlimSauce domain name. A schedule to the agreement listed a wide range of products, including marinades, barbeque sauce, seafood sauce, salsa, horseradish sauce, mayonnaise, and many others, for which Hicks admittedly did not know if appellants had recipes. The MLA also required appellants to commit to a 20-year exclusive endorsement of SlimSauce. Because they wanted to focus on RunWalk, appellants negotiated down their promotional appearances from six to two a year.

Hicks testified that appellants failed to appear as promised at two promotional events for SlimSauce immediately after the signing of the MLA, even though he had no documentary evidence showing appellants had agreed to appear at those events; appellants insisted they could not have promoted an unlicensed product at events held under the "Biggest Loser" license. Jackie endorsed a different brand of low-calorie dressing in an interview held before she signed the MLA, but posted at a later date.

---

[5] Nor had Hicks received a response to an earlier email he had sent with regard to pitching the SlimSauce idea to the Schwan Foods Company in October 2011. In that email, Hicks had asked, "What would it take from Dan's recipe ideas to get three or four sauces ready for that deal? Obviously, Schwan would be the manufacturing commercialization of the recipes, but how would we get started?"

[6] The MLA also was signed by Sleep Concepts, Hicks, and Nilsen.

By the end of February 2012, appellants had arranged to use the $600,000 compensation they expected to receive under a three-year contract to endorse a nutrition bar to cover the fees due NBC for the RunWalk license. The owner of the nutrition bar business, David Nolan, offered to invest an additional $900,000 in RunWalk in exchange for 51 percent of FitWorld. Appellants asked Hicks to accept a dilution of his share down to 5 percent, along with a dilution of theirs to below 40 percent, in order to satisfy the claims of Nolan and several other investors. They also offered to "relinquish all ownership in anything to do with slim sauce but would also remove our name and likeness from any slim sauce products. You are free to use any other contestants to promote Slim Sauce."

A heated exchange followed. In an email he sent on February 25, 2012, Hicks blamed appellants for asking to be released from the MLA, diluting his share in FitWorld, and entering into an earlier investor agreement that encumbered FitWorld and pledged the RunWalk license as collateral without consulting him.[7] Jackie responded with indignation, threatening to quit rather than be "bullied" by Hicks. After tempers settled, an unsuccessful attempt was made to sell both Hicks's share in FitWorld and the SlimSauce idea to Nolan, and Hicks eventually agreed to be bought out of FitWorld for $75,000.

In a March 2, 2012 email, Hicks informed Jackie that if the FitWorld buyout deal was completed by wire transfer that day, "we will take the SlimSauce deal offered by you . . . ." He demanded a wire transfer of the first of 12 installments of $2,000, which was "in respect to a complete release from the SlimSauce agreement in terms of the use

---

[7] In relevant part, Hicks wrote: "As of today, my entity, Boots Holdings LLC holds 50% of the entity of FitWorld Group LLC. We have had verbal discussions to amend that ownership, based upon a proposal that you gave me in Fall, 2011 that included your offer to increase my ownership in SlimSauce in return for accepting a dilution in my ownership in FitWorld Group (as evidenced by our signatures on the SlimSauce agreement, signed in December 2011). Your recent proposal asks that you now be released from that SlimSauce agreement and that I reduce my 50% ownership of FitWorld Group to 5%."

6

of your likeness, image, etc. and include[d] the surrender of your ownership in SlimSauce." The money was to be wired to Nilsen's bank account by the end of the day "for this agreement to be accepted by us."

The buyout of Hicks's shares in FitWorld was memorialized in a redemption agreement, which was negotiated over several days. In a March 11 email, Hicks acknowledged, "I did receive the payment this week regarding [FitWorld] and your first $2,000 payment," but now he wanted to sign a "similar agreement" to the one signed on the FitWorld deal. He attached a proposed formal release, which Jackie rejected. On April 10, Hicks rejected Jackie's proposed release, stating that "we just don't seem to be able to meet on this revision to our original agreement." He offered to refund "the $2,000 that arrived by wire transfer from you" and to return to the MLA. He demanded that appellants transfer the domain name and forward him Dan's recipes immediately in order to complete his trademark application. Appellants did not receive a refund and did not respond to Hicks's demands.

At trial, Hicks denied receiving a wire transfer from appellants on March 2, 2012, or at any time after that date, and explained that what he mistakenly referred to as a wire transfer in his emails was a $2,000 check he received from appellants; the check was undated and the bank refused to accept it because Nilsen's name was misspelled as "Shannon M."[8]

Sleep Concepts sued appellants in September 2012.[9] It asserted claims for breach of contract, breach of fiduciary duty, fraud, specific performance, and claim and delivery. Sleep Concepts' trial brief argued that appellants completely failed to perform under the MLA; that they financed the first investment in FitWorld without Hicks and Nilsen's

[8] Jackie testified that the check was sent on April 9, 2012, to cover the second of 12 installments, after the first payment had gone directly into Nilsen's account. Although it was marked as one of Sleep Concepts' exhibits, the check is not included in the record on appeal. Appellants did not present documentary evidence of the wire transfer.

[9] Since the complaint and cross-complaint are not in the record on appeal, we borrow the description of their respective claims from the trial briefs.

7

consent; that they misrepresented to Hicks between May and July 2007 that they were interested in creating a business based on RunWalk events and SlimSauce products, signed a memorandum of understanding and MLA on July 29, 2011, and immediately after obtaining the RunWalk license demanded a change of the ownership interests in SlimSauce and RunWalk; that the recipes and appellants' endorsement were unique and subject to specific performance, and that Sleep Concepts, Hicks, and Nilsen were entitled to the recipes, domain name, use of appellants' images, and their promotional support.

Appellants cross-complained against Sleep Concepts, Hicks, and Nilsen for breach of contract and invasion of privacy for the allegedly unauthorized use of their photographs to promote SlimSauce; they sought declaratory relief on their interest in and obligation to Sleep Concepts, as well as the involuntary dissolution of the company and the cancellation of their interest in it.[10]

At trial, Sleep Concepts presented expert testimony of the present value of its lost profits for the SlimSauce product line over 20 years, which was estimated to be over $52 million. In closing, its counsel requested damages in that amount. Counsel made no specific request for punitive damages, even though a general request was included in the trial brief.

After a four-day bench trial, the court took the matter under submission; three months later, it issued a ruling in the form of a minute order. With few exceptions, the language of the ruling was borrowed verbatim from Sleep Concepts' trial brief, including typographic errors, factual inaccuracies, and irrelevant arguments.[11] The court apparently

---

[10] Appellants' cross-claims were based on Hicks's posting of a photograph where they wore clothes bearing the "Biggest Loser" logo on a mock-up website he set up from April to July 2012 in order to obtain a trademark for the name "SlimSauce" Appellants also were concerned that in filings with the State of Nevada, Hicks had designated them as "managing members" of Sleep Concepts, without their knowledge and consent.

[11] A few examples: The minute order copied the trial brief's incorrect factual statements that appellants had to pay NBC $600,000 and that the MLA was signed in July 2011. In the language of the trial brief, it concluded that appellants' "total refusal . . . to do none of the promises" between them and Sleep Concepts constituted breach of contract. It copied the facts supporting the claim for breach of fiduciary duty, which had

8

accepted the theories of fraud and breach of contract laid out in the trial brief, repeating the statements in the trial brief that appellants refused to perform under the MLA, that they made misrepresentations "[p]rior to July 29, 2011," and Sleep Concepts, Hicks, and Nilsen "were defrauded by [appellants] to gain control over RunWalk." The only independent factual finding the court made was that Dan "never developed, created and possessed any recipes for SlimSauce and had not so informed HICKS." Ultimately, the court ruled: "Plaintiff has no interest in FitWorld Group, LLC, and defendants have no interest in SlimSauce. Cross-complainants shall take nothing on their cross-complaint. Plaintiff is entitled to damages from [d]efendants . . . for breach of their agreement with Sleep Concepts Therapy, LLC in the sum of $500,000 and punitive damages in the amount of $50,000."

The judgment drafted by Sleep Concepts' attorney, while incorporating the court's ruling, misidentified all cross-defendants as plaintiffs. Appellants' motion for a new trial was denied. This appeal followed.

## DISCUSSION

### I

When a respondent does not file a brief, we "may decide the appeal on the record, the opening brief, and any oral argument by the appellant." (Cal. Rules of Court, rule 8.220(a)(2).) We examine the record guided by the appellant's brief and reverse only if prejudicial error is shown. (See *In re Bryce C.* (1995) 12 Cal.4th 226, 232–233.) The appellant has the burden of providing an adequate record and must show error

---

to do with appellants' obtaining an investment for FitWorld, without acknowledging that Sleep Concepts never had an interest in FitWorld. It also copied language suggesting that Sleep Concepts, Hicks, and Nilsen were all entitled to specific performance and claim and delivery, without acknowledging that Hicks and Nilsen were not plaintiffs; to that language, the court added its finding that there were no recipes but did not clearly deny the requested relief.

affirmatively. If the record on an issue is inadequate, it must be resolved against the appellant. (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 187.)

Appellants have provided a complete reporter's transcript of the bench trial; a partial clerk's transcript, which does not contain the pleadings; and an incomplete set of exhibits, which does not contain any of Sleep Concepts' exhibits. They acknowledge that the record on appeal is incomplete, but argue that this is because the trial court returned the exhibits to the respective party that had offered them, and that "Plaintiffs / Respondents" did not comply with the court's request that they provide the exhibits. Appellants are not absolved of their duty to provide an adequate record on appeal. We note in particular that their briefs in support of the motion for a new trial contain citations to Sleep Concepts' exhibits, suggesting that appellants had copies of at least some of these exhibits in their possession.

Appellants, who represented themselves at trial, complain that the creation of a record in the trial court was problematic. The reporter's transcript indicates that Sleep Concepts' attorney had prepared an exhibit book, which he used to examine witnesses; however, very few exhibits out of the book were actually marked for identification during trial. At the end of trial, counsel specifically stated that he wished all exhibits in the book to be admitted into evidence. The court responded that exhibits marked for identification would be admitted and allowed counsel to check with the court clerk. Counsel asked the clerk about a few exhibits between numbers 23 and 31, but did not check whether the lower numbered exhibits had been marked for identification. Neither did appellants. Nevertheless, it appears that the exhibit book was left with the trial court for its consideration.

Generally, where a document is produced by a party and given to the trial court for its consideration, and it is clear that the court considered the document after both parties had an opportunity to examine witnesses about it, the lack of a formal tender of evidence "does not deprive the document of its true character as evidence." (*Walsh v. Walsh* (1952) 108 Cal.App.2d 575, 579.) The problem in this case is that it is not clear from the trial court's ruling whether the court considered any exhibits, or much of any evidence

presented at trial, since it copied almost all factual findings word for word from Sleep Concepts' trial brief. "In *nonjury* trials, where the *judge* is the *trier of fact*, a trial brief is an instrument of advocacy"; it argues "the facts as well as the law." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2015) ¶ 1:331, p. 1-92.) It is axiomatic that argument of counsel is not evidence. (*Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1173.)

Because of the apparent problems in the judgment and the court ruling on which it was based, we choose to entertain this appeal on an incomplete record, relying heavily on the reporter's transcript of the trial. Nevertheless, our review is constrained by the doctrine of implied findings and the substantial evidence standard of review. We must presume that the judgment is correct, and that the trial court made all factual findings necessary to support it; we review the court's express and implied findings of fact for substantial evidence. (*Brewer v. Carter* (2013) 218 Cal.App.4th 1312, 1320; *In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 293.)[12] In applying the substantial evidence standard of review, "'[w]e have no power to judge . . . the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' [Citations.]" (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) Nevertheless, "'[s]ubstantial evidence . . . is not synonymous with "any" evidence.' . . . Inferences may constitute substantial evidence, but they must be the product of logic and reason." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) Witness testimony that supports the judgment may be rejected on appeal only if "'it is physically impossible or inherently improbable and such inherent improbability plainly appears. [Citation.]'" (*Fuentes v. AutoZone, Inc.* (2011) 200 Cal.App.4th 1221, 1233.)

_____

[12] To avoid the doctrine of implied findings, "[t]he appellant must secure a statement of decision under Code of Civil Procedure section 632 and, pursuant to Code of Civil Procedure section 634, bring any ambiguities and omissions in the statement of decision to the trial court's attention." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.) The record does not show, nor do appellants argue, that they sought or secured an actual statement of decision.

11

II

Appellants argue that Hicks's March 2, 2012 email created a unilateral contract, which they accepted by sending the wire transfer he requested, and, as a result, were released from the MLA through a novation.

A novation is a new agreement that supplants the original contract and extinguishes the original obligation. (Civ. Code, § 1531, subd. (1); *Wells Fargo Bank v. Bank of America* (1995) 32 Cal.App.4th 424, 431.) The parties must clearly intend to extinguish rather than merely modify the original agreement. (*Vallely Investments, L.P v. Bancamerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 832 ["A novation requires an express release by the party entitled to enforce a promise"].) The "interpretation of a contract is subject to de novo review," but only "where the interpretation does not turn on the credibility of extrinsic evidence." (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843.) Where the extrinsic evidence is in conflict, "'the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence. [Citation.]'" (*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 713.)

Appellants relied on evidence extrinsic to the March 2, 2012 email to establish that the email created a novation. The trial court made no express finding on the issue, but we must presume it concluded there was no novation if that conclusion is supported by substantial evidence in the record.

In the March 2, 2012 email, Hicks purported to accept, on behalf of himself and unspecified others, a "SlimSauce deal" offered by appellants, on two conditions: that "the [FitWorld] deal [would be completed] via wire transfer . . . as offered" and that $2,000 would be transferred to Nilsen's account; both transfers were to occur that day. The $2,000 payment was described as the first of 12 payments of $2,000; it was said to be "in respect to a complete release from the SlimSauce agreement in terms of the use of your likeness, image, etc. and include[d] the surrender of your ownership in SlimSauce."

The main dispute at trial was whether appellants sent the wire transfer as required. Hicks testified that they did not, and that all he received was a defective check that could

12

not be deposited.  Appellants invite us to reject Hicks's testimony as incredible by comparing it to other evidence, specifically his contemporaneous emails, in which he acknowledged receipt without indicating any flaw in appellants' performance.  Under the substantial evidence standard of review, we can reject witness testimony which supports the judgment only if that testimony is incredible "on its face"—that is, without the need to compare it to other evidence.  (*Fuentes v. AutoZone, Inc*., *supra*, 200 Cal.App.4th at p. 1234.)  We cannot redetermine Hick's credibility as to whether he in fact received a wire transfer because his testimony on that issue is not inherently incredible.

The legal significance of Hicks's contemporaneous acknowledgment of receipt of a payment without notifying appellants of any defect in their performance is a different matter.  A party may waive conditions in a contract, and an offeror may waive a provision in an offer specifying the means of its acceptance.  (*Sabo v. Fasano* (1984) 154 Cal.App.3d 502, 505.)  A waiver may be implied from the injured party's conduct, including its continuation of performance, or acceptance of the other party's continued performance.  (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 857, p. 944.)  It was undisputed at trial that Hicks did not object to the untimeliness of, or any other defect in, appellants' first payment.  Rather, on March 11, 2012, he acknowledged its receipt and proceeded to attach a formal release for appellants' signature.  Appellants rejected the proposed release, which is not in the record on appeal.

At trial, Sleep Concept's position was that, by its terms, the MLA could not be modified without a writing signed by all parties, and that the March 2, 2012 email was not binding without a signed formal release.  However, a novation is a new contract, rather than a modification of the existing one, and if the parties' objectively expressed intent was to be bound by the terms of the March 2, 2012 email, the fact that they failed to agree on the language of the subsequently proposed release would be irrelevant.  (See *Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299, 308.)

The March 2, 2012 email is ambiguous in two important respects.  First, it is unclear whether the statement, "This payment is in respect to a complete release . . . ," was intended to mean that, upon payment of $2,000, appellants would automatically be

released from the MLA, or that they would be released in a subsequent formal release. It is clear that by March 11, 2012, after a formal redemption agreement was signed in the FitWorld deal, Hicks insisted on a "similar agreement" in the SlimSauce deal.

Second, and more important, Hicks's reference to a "complete release" in the March 2, 2012 email is qualified by the phrase "in terms of the use of your likeness, image, etc." We interpret the former phrase in context, so as not to render the latter phrase "surplusage." (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 503.) We give the words their common dictionary meaning. (*Blasiar, Inc. v. Fireman's Fund Insurance Co.* (1999) 76 Cal.App.4th 748, 754.) The common meaning of "et cetera" is "and others . . . of the same kind." (Merriam-Webster's Collegiate Dict. (10th ed. 1995) p. 398.) It suggests that Hicks did not agree to release appellants from all their obligations under the MLA, but only from their obligation to endorse SlimSauce. Appellants' earlier email, on February 23, 2012, indicates they had offered to "relinquish all ownership in anything to do with slim sauce but would also remove our name and likeness from any slim sauce products." Appellants' own email supports the conclusion that they offered to give up their rights in SlimSauce, but failed to clearly demand a complete release from all their obligations under the MLA. That opened the door to Hicks's continued demands that appellants turn over the SlimSauce domain name and recipes, which he claimed were their remaining obligations under the MLA, so he could develop the SlimSauce product line with other contestants.

Hence, even if Hicks waived any defect in appellants' first $2,000 payment, it is reasonable to infer that the terms of the SlimSauce deal, which appellants had proposed and which Hicks purported to accept, were not sufficiently clear to completely extinguish appellants' obligations under the MLA. Because Hicks, on behalf of himself and any other parties of the MLA he purported to represent, did not unambiguously promise a complete release of appellants from the MLA, no novation occurred.

### III

Assuming that they breached the MLA, appellants argue that the damage award is not supported by substantial evidence. At trial, Sleep Concepts requested over $52

14

million in damages based on its expert's estimate of the present value of the company's lost profits over the 20-year term of the MLA.[13] The trial court rejected that amount, and instead awarded $500,000. The court did not explain what evidence supported the reduced award, and the record before us shows Sleep Concepts did not prove its entitlement to damages for lost profits.

Lost profits may be recoverable as breach of contract damages if their occurrence and extent are reasonably certain. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773–774 (*Sargon Enterprises*).) The claim of lost profits of an unestablished business is "'generally objectionable'" because "'their estimation is conjectural and speculative'"; lost profits for such a business are allowed only "'where their nature and occurrence can be shown by evidence of reasonable reliability.' [Citation.]" (*Id*. at p. 774.)

Lost profits may be proven with reasonable reliability where the owners have experience in the business they are seeking to establish, and the business is in an established market. (*S. Jon Kreedman & Co. v. Meyers Bros. Parking–Western Corp.* (1976) 58 Cal.App.3d 173, 184–185.) The proof may involve expert analysis of "economic or financial data, market survey, or . . . the business records or operating histories of similar enterprises." (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 888.) "'[T]here must be "'a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed.'"' [Citation.]" (*Sargon Enterprises*, *supra*, 55 Cal.4th at p. 778.) To be admissible and to constitute substantial evidence, the expert's testimony should not be based on assumptions unsupported by record evidence; nor should the expert rely on speculation and conjecture. (*Id*. at p. 770; *Roddenberry v. Roddenberry*, *supra*, 44 Cal.App.4th at p. 651.)

---

[13] As an alternative measure of damages, Sleep Concepts' counsel argued that appellants would derive over $60 million from RunWalk events over 20 years. As we shall explain, the estimate was based on a gross misrepresentation of appellants' testimony. In any event, the profitability of RunWalk has no bearing on Sleep Concepts' entitlement to damages based on appellants' breach of the MLA, which had nothing to do with RunWalk.

15

At trial, Sleep Concepts' expert explained that he relied on a report by a company called Fintel, which provides data about existing industry segments, based on financial statements for companies of various sizes and an average for the entire industry. He also considered a report about consumer trends in sauces, dressings and condiments in the United States. From these reports, he concluded that there was an existing market for the products listed in the MLA, none of which was new or unique. Hicks provided the pricing and cost structure for the proposed business; the expert verified Hicks's numbers against a report for the distribution of a particular dressing and accepted his projected price per unit as reasonable. For year one, the expert approved Hicks's projection of $4,145,200 in gross revenue, along with his projections of cost per unit, promotional cost, operating expenses, pre-tax income, taxes due, and net income. The projected revenue was to come from sales to "Biggest Loser" fans, grocery retail sales, internet sales, and licensing sales.

The expert's written report was admitted in evidence but has not been included in the record on appeal, and we have no means of verifying the soundness of the calculations. However, the expert admitted he had not been asked to, and did not, consider what the startup costs for the yet nonexistent business would be. When asked about those costs, the expert speculated that "there would be a—say a month or so the cost associated with things like salaries and some initial marketing expenses, but I did not consider that to be actually material . . . ."

It is clear that at the time the MLA was signed in January 2012, there existed nothing more than an idea and a name for a product line. The trial court found there were no recipes, and substantial evidence in the record supports a finding that there were no "proprietary" recipes. As Dan explained, he simply mixed brand-name products, such as Hellman's low-fat mayonnaise and Chipotle seasoning, to create his low-calorie version of a Chipotle Ranch Dressing. The expert's off-hand estimate that, within a month or so, a business based on a nonexistent product may be brought from the conceptual to the marketing and distribution stage is conjecture at best.

16

Neither Hicks nor appellants had any experience in the food industry, and Hicks's email to appellants in October 2011 suggests he had no idea what it would take to prepare actual sauces from Dan's recipe "ideas" for a pitch to a food company. To conclude that a food company would have been interested in commercializing recipes based on mixing existing brand-name products would be speculative. Nor is there evidence reasonably supporting Hicks's self-serving assumption at trial that Sleep Concepts would have been immediately successful in attracting investment capital for SlimSauce and outsourcing its production to a cold packer. That assumption was based on a flawed analogy to the success of RunWalk and the presumed success of the nutrition bar appellants were paid to promote. However, Dan testified that the nutrition bar never launched, and Nolan instead invested in RunWalk, which already had been licensed by NBC. In contrast, SlimSauce was an idea for a nonexistent product line that both NBC and Nolan had rejected. The assumption that the SlimSauce product line would have come to fruition, let alone that it would have been immediately profitable, was no more than wishful thinking.

Sleep Concepts' expert recognized that, unless uniquely promoted, the SlimSauce products would have been undifferentiated from already existing low-calorie sauces and dressings. As to how successful a promotion based on celebrity endorsement would have been, the expert responded, "That is very difficult to answer." While certified and experienced in business valuation, the expert admitted he had not done much work on celebrity valuations; nor did he reference any aids he had used to guide his valuation of appellants' celebrity status. The expert acknowledged that appellants are not A-list celebrities like Paul Newman; nevertheless, for purposes of product recognition, he believed they would have the same short-term effect, apparently due to the popularity of "The Biggest Loser."

It is undisputed that SlimSauce was declined a "Biggest Loser" license by NBC, and Hicks testified he assumed the product line would not be licensed by NBC. At trial, appellants and Hicks disagreed whether appellants could endorse an unlicensed product at their licensed RunWalk events, but even Hicks agreed NBC had become stricter about the use of the "Biggest Loser" logo. Yet, to gauge appellants' popularity, Hicks, who

was not qualified as a valuation expert, relied on "metrics relating to the show," such as the close to 2 million "likes" on the NBC "Biggest Loser" Facebook fan page, rather than on appellants' own Facebook pages. Sleep Concepts' expert endorsed Hicks's approach without providing any reasoned justification for gauging the marketability of a product sponsored by past contestants on "The Biggest Loser," but not licensed or promoted by NBC, by comparing it to the popularity of the show itself.

Other than the speculative evidence of its lost profits, Sleep Concepts claimed no other actual damages. The award of $500,000 in compensatory damages is, therefore, unsupported by evidence.

IV

The award of $50,000 in punitive damages against appellants also must fail. While punitive damages may not be awarded for mere breach of contract, they may be awarded where "a defendant fraudulently induces the plaintiff to enter into a contract." (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 135, citing Civ. Code, § 3294.) However, "actual damages are an absolute predicate for an award of exemplary or punitive damages. [Citations.]" (*Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147; see also *Fullington v. Equilon Enterprises, LLC* (2012) 210 Cal.App.4th 667, 674; see *Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 530.) Where "the evidence fails to establish a basis to recover any of the damages awarded" by the trier of fact, "the punitive damages award must be reversed because punitive damages cannot be awarded without actual damages. [Citations.]" (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 758.) Since Sleep Concepts did not prove it had suffered actual damages, the punitive damages award cannot stand.

The punitive damage award cannot be sustained also because Sleep Concepts presented no meaningful evidence of appellants' financial condition. (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 680.) "Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income." (*Ibid.*) Here, no evidence was introduced regarding appellants' assets, overall income,

18

expenses, and liabilities. At most, Sleep Concepts' counsel elicited some unspecific testimony about the general revenues from RunWalk, but not appellants' share of those revenues. Jackie testified appellants were hoping to do 28 races and some "off-road challenges" with another company. She testified that while their largest race had 3,500 participants, the races usually averaged 12 people. The entry fees started at $15 for children and $25 for adults, and went up to $95. Sleep Concepts' counsel repeatedly misstated Jackie's testimony as proof that appellants organize 40 races a year with 1,500 participants per race and a $50 entrance fee.

Although the court did not expressly state that it awarded punitive damages for fraud, it made disparate findings of misrepresentation, nondisclosure, and fraud, which appellants challenge independently. Fraud (be it fraud in the inducement or promissory fraud) generally consists of "'(a) misrepresentation (false representation [or promise], concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

The court uncritically adopted Sleep Concepts' theory that appellants feigned interest in SlimSauce because they wanted to gain control over RunWalk and convince Hicks to give up his ownership in FitWorld. That theory was based on an incomplete and misleading statement of the facts.

To begin with, as we have noted, the claimed damage to one of Hicks's entities, Boots Holding, from the loss of its shares in RunWalk is of questionable relevance to the damages his other entity, Sleep Concepts, claimed to have sustained from appellants' failure to perform their obligations with regard to the SlimSauce product line. Furthermore, there is no substantial evidence that appellants actually gained control of FitWorld. Under the substantial evidence standard of review, we must credit Hicks's testimony that appellants demanded a 75 percent share of FitWorld immediately after NBC approved the RunWalk license in October 2011. But that is not the share with which appellants apparently ended. Rather, in February 2012, when appellants asked Hicks to dilute his interest to 5 percent, Hicks claimed Boots Holding still owned 50

19

percent of FitWorld. At the same time, appellants' combined interest in FitWorld was to drop below 40 percent to accommodate Nolan's demand for a 51 percent share in exchange for his sizeable investment in RunWalk. No evidence was offered in support of Hicks's stated belief that appellants ended up owning 90 percent of RunWalk.[14] It would be speculative to conclude that appellants colluded with Nolan to gain a combined majority interest in FitWorld, just because they already had an endorsement deal with his company and convinced him to invest a combined $1.5 million in RunWalk.

Jackie's testimony supports the conclusion that appellants had lost faith in SlimSauce after NBC refused to license the product line, which is why they offered Hicks 75 percent in that business. Even assuming appellants did not communicate their waning enthusiasm to Hicks at the time, it is undisputed that at the end of February 2012, appellants simultaneously asked to be released from their endorsement obligations under the MLA and proposed to dilute Hicks's interest in FitWorld to 5 percent. Thus, when he made the decision to sell his entity's shares in RunWalk, Hicks already knew appellants did not want to promote SlimSauce. Under the circumstances, it is unreasonable to conclude that his decision to sell the FitWorld shares was induced by appellants' feigned interest in the product line.

The trial court also found that before July 29, 2011, the date on which they signed the original memorandum of understanding, appellants had falsely represented they were interested in creating a business based on SlimSauce products, and that Dan had "never developed, created or possessed any recipes for SlimSauce and had not so informed" Hicks. Hicks's testimony does not make clear what exactly Dan said during the original conversations that led Hicks to believe any "proprietary" recipes existed, beyond the mixing of products already available on the market. But even assuming Dan exaggerated the extent of his success in developing original recipes for low-calorie dressings, sauces, and spreads, the question is whether Hicks (on behalf of his entity Sleep Concepts)

---

[14] At the bench trial, Hicks expressed this belief during a brief exchange about a separate lawsuit in Texas and with regard to a separate FitWorld entity incorporated in Illinois.

reasonably relied on Dan's original misrepresentations, or on appellants' subsequent failure to set the record straight.

Hicks did not testify Dan represented that nutritionists were involved in developing any actual recipes; rather, Hicks himself made that representation to NBC, based on the presence of nutritionists on "The Biggest Loser." Similarly, Hicks did not claim Dan told him that he had recipes for all products listed in the MLA; rather, Hicks claimed to have been misled by appellants' failure to deny affirmatively that any proprietary recipes existed. Before the MLA was signed, Hicks asked whether any of Dan's recipes were written down, so that they could be included in the MLA, and how his recipe ideas could be turned into three or four sauces; he received no response. Even assuming appellants had a fiduciary duty to affirmatively disclose there were no proprietary recipes (see *Scafidi v. Western Loan & Bldg. Co.* (1946) 72 Cal.App.2d 550, 562–563), it is questionable whether Hicks could reasonably rely on their silence to exaggerate what Dan originally told him and to expand the number of recipes for the formulation of which appellants would be solely responsible under the MLA.

V

Because Sleep Concepts failed to prove its entitlement to damages, the damage award must be reversed, together with any findings of fraud supporting the award of punitive damages. (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919 ["'where the plaintiff's evidence is insufficient as a matter of law to support a judgment for plaintiff, a reversal with directions to enter judgment for the defendant is proper'"].)

Appellants do not challenge the rest of the court's ruling, which was incorporated into the judgment. For the sake of clarity, we affirm the rest of the judgment with the following caveats: (1) We assume the court did not award any additional affirmative relief on the complaint. Both the court's ruling and the judgment include sundry passages copied from Sleep Concepts' trial brief, purporting to entitle not only Sleep Concepts, but also Hicks and Nilsen, to specific performance, or claim and delivery, even though Hicks and Nilsen, were not parties to the complaint. Although the court did not expressly deny the requested relief, it implicitly did so because it did not order appellants

21

to specifically perform the MLA.  (2) The court denied appellants' cross-complaint but nevertheless cancelled their interest in "SlimSauce," which we understand to include their interest in Sleep Concepts.

**DISPOSITION**

The award of compensatory and punitive damages is reversed, and Sleep Concepts takes nothing under the complaint.  The cancellation of appellants' interest in SlimSauce and the denial of the rest of their cross-complaint are affirmed.

Appellants are to bear their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


MANELLA, J.


COLLINS, J.

22